David H. Leigh, Esq. (A9433)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Beneficial Tower
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
E-mail: dleigh@swlaw.com

Attorneys for **FINANCIAL FEDERAL CREDIT INC.**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**WOLPER CONSTRUCTION, INC. aka WOLPER LANDSCAPING AND CONSTRUCTION,**<br><br>Debtor. | Bankruptcy No. 08-24034<br><br>Chapter 11<br><br>Honorable William T. Thurman |

### STIPULATED MOTION FOR ENTRY OF ORDER
### TERMINATING AUTOMATIC STAY

Wolper Construction, Inc. aka Wolper Landscaping and Construction, the Debtor in the
above-captioned Chapter 11 bankruptcy case (the "Debtor"), and Financial Federal Credit Inc., a
secured creditor of the Debtor ("FFCI") (together, with the Debtor, the "Parties"), through
counsel, hereby stipulate, agree and jointly move this Court as follows:

      1.      FFCI is a secured creditor of the Debtor and holds a validly perfected first-priority
lien in all of the Debtor's assets (the "Collateral") including that certain (i) 375 CAT Hydraulic
Excavator, Serial No. 1JM00427; (ii) TA40 Terex Articulated Dump Truck; Serial No.

8909534

A8421054; and (iii) TA40 Terex Articulated Dump Truck; Serial No. A8421044 (collectively, the "Surrendered Equipment").

2.      FFCI's lien against the Collateral, including the Surrendered Equipment, secures the repayment by the Debtor of its contractual obligations under (i) that certain *Promissory Note*, dated January 28, 2004, in the original amount of $279,888.00 ("Note #1") and related *Security Agreement*, dated January 28, 2004; (ii) that certain *Promissory Note*, dated June 21, 2005, in the original amount of $383,472.00 ("Note #2") and related *Security Agreement*, dated June 21, 2005; (iii) that certain *Lease Agreement*, dated June 12, 2006, in the original amount of $1,159,746.00 (the "Lease"); and (iv) that certain *Lease Extension Agreement*, dated October 30, 2007 (the "Lease Extension") (collectively, the "Pre-Petition Loan Agreements"). True and correct copies of the Pre-Petition Loan Agreements are attached hereto as Exhibit "A" and incorporated herein by this reference.

3.      The Pre-Petition Loan Agreements are now in default and have been in default for some time.

4.      Prior to the Petition Date, the Debtor voluntarily surrendered and FFCI repossessed the Surrendered Equipment pursuant to the terms and conditions of the Pre-Petition Loan Agreements.

5.      As of the Petition Date, the Debtor was indebted to FFCI in the amount of $657,000.68, plus interest, fees and costs, including attorneys' fees and costs (collectively, the "Indebtedness"). The Parties hereby stipulate and agree that the current value of the Surrendered Equipment is less than the amount of the Indebtedness owed by the Debtor to FFCI under the Pre-Petition Agreements.

6.      Pursuant to 11 U.S.C. § 362(d)(1), Federal Rule of Bankruptcy Procedure 4001(d), and the Local Rules of this Court, the Parties stipulate and agree that FFCI's interest in the Surrendered Equipment is not adequately protected, there is no equity in the Surrendered

Equipment that could be used for the benefit of creditors of the Debtor, and that the Equipment is not necessary for an effective reorganization.

7.    For these reasons, the Parties stipulate and agree that the Court may enter an Order, the proposed form of which is attached hereto as Exhibit "B," terminating the automatic stay as it relates to FFCI and the Surrendered Equipment and authorizing FFCI to foreclose upon, sell or otherwise liquidate its interest in the Surrendered Equipment pursuant to applicable non-bankruptcy law without further notice or hearing.

8.    Prior to the Petition Date, the Debtor also surrendered to FFCI a 2006 Ford 750 Oil & Lube Truck, Vin No. 3FRXF75H46V384484, equipped with IMT 13' Sitestar Mobile Lubrication unit, Serial No. LUBE061031 (the "Truck") pursuant to the terms and conditions of the Pre-Petition Loan Agreements. Following the Petition Date, the Debtor requested a return of the Truck. The Parties hereby further stipulate and agree that the Debtor may, at its own cost and expense, make the necessary arrangements to pick up the Truck from a physical location to be designated by FFCI.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

WHEREFORE, the Parties respectfully request that the Court enter an Order approving the terms and conditions of this Stipulation and Joint Motion and granting the relief requested herein as set forth above.  The Parties further request that the Court's Order terminating the automatic stay take effect immediately, and that the ten (10) day stay period set forth in Federal Rule of Bankruptcy Procedure 4001(a)(3) expressly not apply.

DATED this 14th day of July, 2008.

Snell & Wilmer L.L.P.

/s/ David H. Leigh

_____

David H. Leigh
Attorneys for Financial Federal Credit Inc.

1 On 1 Legal Services

/s/ Andres Diaz

_____

Andres Diaz
Attorney for the Debtor

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2008, a true and correct copy of the foregoing was served on the following parties via the Court's CM/ECF system:

- James W. Anderson    anderson@mmglegal.com
- Mona Lyman Burton    mburton@hollandhart.com, ckelly@hollandhart.com
- Andres' Diaz    courtmail@adexpresslaw.com
- Dennis R. James    djames@mmrj.com
- Peter J. Kuhn tr    Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov
- David E. Leta    dleta@swlaw.com, wsmart@swlaw.com,;kgoley@swlaw.com
- Stephen W. Lewis    slewis@utah.gov
- Adelaide Maudsley    maudsley@chapman.com, jemery@chapman.com
- Robert S. Prince    rprince@kmclaw.com, squilter@kmclaw.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Kim R. Wilson    bankruptcy_krw@scmlaw.com

I hereby further certify that on July 15, 2008, a true and correct copy of the foregoing was served on the following parties by depositing a copy of the same in the United States mail, first-class postage prepaid, addressed as follows:

Scott Rasmuson
White and Rasmuson
2195 West 5400 South, Suite 200
Salt Lake City, UT 84118

**EXHIBIT A**
(Pre-Petition Loan Agreements)

# PROMISSORY NOTE

| **$279,888.00** | **Salt Lake City** | **UT** | **January 28, 2004** |
|---|---|---|---|
| (Total of Note) | (City) | (State) | (Date) |

FOR VALUE RECEIVED, Wolper Construction, Inc. ("Maker") promises to pay to the order of Financial Federal Credit Inc. ("Holder"), at 7 Corporate Park, Suite 240, Irvine, CA, 92606, or such other place as Holder may, from time to time, designate in writing, the amount of Two hundred seventy-nine thousand eight hundred eighty-eight and 00/100 Dollars ($279,888.00), payable in consecutive monthly installments, as follows:

| | | | | |
|---|---|---|---|---|
| 48 | installments, each in the amount of | $ | 5,831.00 | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | ; then |
| | installments, each in the amount of | $ | | |

Said consecutive monthly installments shall commence on the 1st day of March, 2004, and continue on the same day of each month thereafter until the indebtedness evidenced hereby is paid in full; with interest from the date hereof being payable on the unpaid principal amount at the maturity of each installment at the rate of --- --- --- --- --- --- percent (--- ---%) per annum (but in no event shall such rate exceed any maximum permitted by applicable law). Maker shall also pay to Holder on demand, on each installment (of principal and/or interest) not fully paid prior to the fifth day (or such longer period as required by law) after its due date, a late charge equal to the maximum percentage of such overdue installment legally permitted as a late charge, not to exceed five percent (5%); and after maturity of the entire indebtedness (whether by acceleration or otherwise), Maker shall pay, on demand, interest on the unpaid indebtedness (excluding unpaid late charges) at the maximum lawful daily rate, but not to exceed 0.0666% per day, until paid in full. Interest shall be calculated on the basis of a 360 day year and for the actual number of days elapsed, unless such calculation would cause the effective interest rate under this Note to exceed the maximum rate allowed by applicable law, in which case such calculation shall be on the basis of a 365 day year.

Upon nonpayment when due of any amount owing hereunder, or if default occurs under any security agreement, pledge, assignment, deed of trust, or any instrument or document executed to evidence, secure, guarantee, govern or in any way pertain to the loan evidenced by this Note, Holder may, at its option, without notice or demand, accelerate the maturity of the indebtedness then outstanding under this Note and declare same to be at once due and payable whereupon it shall be and become immediately due and payable. Maker, all endorsers, guarantors and any other party liable on this Note also promise and agree to pay Holder's costs, expenses and reasonable attorneys' fees incurred in enforcing and/or collecting this Note. Maker, all endorsers, guarantors and any other party liable on this Note waive presentment for payment, demand, protest, notice of protest and notice of nonpayment, default and dishonor, notice of intent to accelerate, notice of acceleration, and further, to the extent allowed by law, waive all benefits of valuation, appraisement and exemption laws. Holder may, without notice, extend the time of payment of this Note, postpone the enforcement hereof, grant any other indulgence, add or release any party primarily or secondarily liable hereon and/or release or change any collateral securing this Note without affecting or diminishing Holder's right of recourse against Maker, all endorsers, guarantors and other parties liable on this Note, which right is hereby expressly reserved. As used in this Note, the term "Holder" includes any future holder of this Note. If more than one person signs this Note, the obligations of each of them shall be joint and several.

As a material inducement to Holder to advance funds or otherwise provide financial accommodations to or for the benefit of Maker and/or in consideration of Holder having previously done so, it is agreed that Maker shall not, unless otherwise required by law, have any right to voluntarily prepay any indebtedness for borrowed money now or hereafter owing to Holder (whether evidenced hereby or otherwise); provided, however, that Maker may (unless otherwise expressly agreed in writing) have the privilege of voluntarily prepaying any such indebtedness in full or in part at any time or from time to time if Maker shall: (i) give Holder seven days' prior written notice to Holder specifying the principal amount and date of any proposed voluntary prepayment and the indebtedness being voluntarily prepaid; (ii) pay the amount specified in such voluntary prepayment notice, in good funds, on the date specified in such notice; (iii) simultaneously pay, in good funds, all principal, interest and other charges accrued and/or due to Holder through the date of any such voluntary prepayment; and (iv) simultaneously pay a prepayment premium equal to the sum of (a) fifteen hundredths percent (0.15%) of the principal amount then being voluntarily prepaid multiplied by the number of whole or partial calendar months between the date of such voluntary prepayment and the scheduled final maturity date of the indebtedness being prepaid, plus (b) two percent (2%) of the principal amount of the indebtedness then being voluntarily prepaid, but not more than the maximum amount permitted by law. The principal amount of any voluntary partial prepayment shall be applied to the scheduled installments of the indebtedness then being prepaid in the reverse order of their respective maturities, so that the amount and due date of only the latest maturing installment(s) shall be affected thereby.

Notwithstanding anything to the contrary in this Note or any related writing, all agreements between Maker and Holder, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of the maturity hereof or otherwise, shall the interest contracted for, charged or received by Holder exceed the maximum amount permissible under applicable law. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Holder does not intend to charge or collect any unearned interest in the event of acceleration. If, from any circumstance whatsoever, interest would otherwise be payable to Holder in excess of the maximum lawful amount, the interest payable to Holder shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Holder shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of the principal hereof, such excess shall be refunded to Maker. All interest paid or agreed to be paid to Holder shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of the principal (including the period of any extension or renewal hereof) so that the interest hereon for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between Maker and Holder.

COPYRIGHT 1996 FINANCIAL FEDERAL CREDIT INC.

FFCISA/PNI4 (4/03)

The proceeds from the loan evidenced by this Note are to be used for business purposes only, and no part thereof is to be used for primarily consumer, personal, family or household purposes.

**THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. THIS NOTE MAY NOT BE CHANGED OR TERMINATED ORALLY.**

CO-MAKER _____   MAKER   Wolper Construction, Inc.

By: _____   By: _____
                          Title                                              Title

_____
(Witness for Maker and Co-Maker)

## ENDORSEMENT

The undersigned do each (jointly and severally) unconditionally guarantee the prompt payment of the within Note at maturity or any time thereafter, or on default prior thereto, hereby waiving presentment for payment, demand, protest, notice of protest, notice of dishonor and notice of every kind and nature, and accepting all of its provisions and authorizing Holder, without notice to any one or more or all of us, to substitute debtors, and/or to grant one or more extensions in whole or in part, and/or to receive security or additional security for the payment hereof and/or to surrender, release or substitute any such security.

If any payment on this Note is not paid when due, then the remaining unpaid indebtedness shall, without notice or demand, become immediately due and payable, at the option of Holder, and may be recovered in any suit brought by the Holder of this Note against any one or more or all of us, at the option of Holder, whether such suit has been commenced against Maker or not, and in any such suit Maker may be joined with one or more or all of us, at the option of Holder.

The Holder of this Note shall not be required to look to any security given or held for the payment of this Note, but may proceed against any one or more or all of us immediately upon a default in payment or otherwise. Any execution may be immediately levied upon any real or personal property of the undersigned, all rights of the undersigned to have personal property last taken and sold under such execution being hereby expressly waived.

_____
(Endorser)

_____
(Endorser)

_____
(Endorser)

COPYRIGHT 1996 FINANCIAL FEDERAL CREDIT INC.

FFC1 SA/PNH (4/08)

## SECURITY AGREEMENT

| This Security Agreement dated | January 28, 2004 | , is by | Wolper Construction, Inc. |
|---|---|---|---|

("Debtor") whose principal office (or residence) address is

| 3750 West 500 South, Salt Lake City, UT, 84104 | | | in favor of |
|---|---|---|---|

| Financial Federal Credit Inc. | | ("Secured Party") whose address is |
|---|---|---|

7 Corporate Park, Suite 240, Irvine, CA, 92606

1. To secure the payment and performance of all indebtedness, obligations and liabilities of Debtor to Secured Party of whatever kind, whether previously, contemporaneously, or subsequently incurred or created, whether direct or acquired from third parties, whether contingent or fixed, and whether of the same or different classes (including, without limiting the generality of the foregoing, all indebtedness, obligations and liabilities arising out of or relating to (i) advances, payments, loans, endorsements, guaranties, extensions of credit, financial accommodations and/or benefits granted or extended by Secured Party to or for the account of Debtor, (ii) notes, security agreements, lease agreements, rental agreements, installment sale contracts, bailment agreements, guaranties, and/or any other present or future agreements between Debtor and Secured Party, and/or (iii) expenses, charges, commissions and/or interest owing by Debtor to Secured Party or chargeable to Debtor by Secured Party), and all extensions, renewals and/or modifications of the foregoing (collectively, the "Obligations"), Debtor does hereby assign, transfer, pledge and grant to Secured Party a security interest/lien in/upon all property listed on any Schedule to this Agreement (the "Property"), and in all goods, inventory, equipment, accounts, accounts receivable, documents, instruments, chattel paper, contract rights, general intangibles, investment property, securities entitlements, deposit accounts, fixtures and other property, wherever located, now or hereafter belonging to Debtor or in which Debtor has any interest, and in all proceeds, insurance proceeds, substitutions, replacement parts, additions and accessions of and/or to all of the foregoing (collectively, including the Property, the "Collateral"). Debtor and Secured Party acknowledge that Secured Party may (but shall not be obligated to) make future loans or extensions of credit to Debtor, refinance existing Obligations of Debtor, or purchase from third parties loans or indebtedness of Debtor, and Secured Party and Debtor agree that the Collateral shall be security for any and all such indebtedness.

2. Debtor hereby represents and warrants to Secured Party and covenants and agrees with Secured Party as follows: (a) All information supplied and statements made to Secured Party by or on behalf of Debtor relating to the Obligations or the Collateral are and shall be true, complete and accurate, whether supplied or made prior to, contemporaneously with or subsequent to the execution of this Agreement; (b) Debtor has good and marketable title to the Collateral, free and clear of any liens, security interests or encumbrances of any kind or nature whatsoever (except any claimed by Secured Party) and Debtor will warrant and defend the Collateral against all claims; (c) all Collateral listed on any Schedule to this Agreement is in Debtor's possession at the location shown above, unless a different location is disclosed on such Schedule for any item, and shall at all times remain in Debtor's possession and control; (d) Debtor shall not change (i) its name, (ii) the location of any Collateral, or (iii) the location of (as applicable) Debtor's residence, principal place of business, executive office or the place where Debtor keeps its business records, without thirty (30) days prior written notice to Secured Party; (e) Debtor has full, unrestricted and lawful power and authority to sell and assign the Collateral, to grant Secured Party a security interest/lien therein/thereon as herein provided and to execute and perform this Agreement and all other instruments and agreements executed by Debtor in favor of Secured Party; (f) if a corporation, a partnership, or a limited liability company, Debtor is (as applicable): (i) duly formed, organized, validly existing and in good standing in the state of its incorporation or organization, (ii) duly qualified and in good standing in every jurisdiction where the nature of its business requires it to be so qualified, and (iii) authorized by all requisite action of its stockholders and directors, general partners or managers to execute, deliver and perform this Agreement; (g) Debtor will cause Secured Party to have a security interest and lien in/upon the Collateral which at all times shall be duly perfected, enforceable and superior to any liens, encumbrances and interests other than Secured Party's, and Debtor shall not permit the Collateral or any portion thereof to be or become subject to any lien or encumbrance of any kind or nature whatsoever (except any claimed by Secured Party), nor shall Debtor sell, pledge, grant any security interest in, encumber, assign, rent, lease, lend, destroy or otherwise transfer or dispose of, or permit the filing of a financing statement with respect to (other than in favor of Secured Party) any Collateral, nor shall Debtor guarantee any obligation of any other person or entity except in favor of Secured Party, without the prior written consent of Secured Party in each instance; (h) Debtor shall comply (to the extent necessary to protect the Collateral and Secured Party's interest therein) with the provisions of all leases, mortgages, deeds of trust or other contracts affecting any premises where any Collateral is or may be located and with any rules, laws, orders, ordinances or statutes of any state, county, municipality or other authority having jurisdiction relating to such premises and/or the conduct of business thereon and/or use thereof; (i) Debtor shall, at Debtor's sole cost and expense, keep and maintain all Collateral in good condition and repair, and shall use and maintain the Collateral in accordance with all applicable manufacturer's specifications and warranties; (j) all Collateral shall at all times remain personally and shall not become part of any realty to which it may be attached so that Secured Party shall have the unrestricted right (subject only to the terms of this Agreement) to remove all or any portion thereof from any premises where it may be located, and Debtor will obtain and deliver to Secured Party (in a form acceptable to Secured Party) appropriate waivers from landlords, mortgagees and owners of such premises; (k) Debtor shall (at Debtor's expense) upon request by Secured Party, obtain, execute and deliver all assignments, certificates, financing statements or other documents, give further assurances and do all other acts and things as may be necessary to fully perfect Secured Party's interest in the Collateral and to protect, enforce or otherwise effectuate the terms of this Agreement; and (l) Secured Party has no obligation to lend or advance funds unless and until all representations, warranties, conditions and requirements contained herein have been satisfied including without limitation receipt by Secured Party of proof of ownership of the Collateral satisfactory to Secured Party in its sole discretion, and any applicable subordinations and/or lien releases as may be required by, and in a form acceptable to, Secured Party in its sole discretion. Debtor hereby irrevocably designates and appoints Secured Party as Debtor's agent and attorney-in-fact to sign and deliver all such assignments, certificates, financing statements and other documents necessary to perfect, continue and/or enforce Secured Party's interest in the Collateral and to file same with the appropriate office(s). Debtor hereby authorizes Secured Party to file either an original or a reproduction of this Agreement as or with a financing statement in all appropriate locations.

3. Debtor hereby acknowledges the validity of and affirms all of the Obligations, agrees that they are and shall be secured by this Agreement and absolutely and unconditionally agrees to punctually and fully pay and perform all Obligations. Debtor shall pay to Secured Party on demand, on any installment of the Obligations not fully paid prior to the fifth day (or such longer period as required by law) after its due date, a late charge equal to the maximum percentage of such overdue installment legally permitted as a late charge, not to exceed five percent (5%); and after maturity of the entire unpaid indebtedness (whether by acceleration or otherwise) of any one or more of the Obligations, Debtor shall pay, on demand, interest on such matured indebtedness (excluding unpaid late charges) at the maximum lawful daily rate, but not to exceed 0.0666% per day, until paid in full.

4. Debtor shall insure the Collateral against all risks of loss or damage from every cause (including without limitation fire, theft, vandalism, accident, flood, earthquake and extended coverage) for not less than the full replacement value as determined by Secured Party in its sole discretion, and shall carry liability and property damage insurance covering the Collateral. All insurance shall be in form and amount and with licensed, solvent companies approved by Secured Party, and shall name Secured Party as sole loss payee. Debtor shall pay the premiums therefor and deliver said policies or duplicates to Secured Party. Each insurer shall agree by endorsement upon the policy or policies issued by it or by independent instrument furnished to Secured Party to give Secured Party 30 days prior written notice before the policy shall be modified or canceled and that Secured Party's coverage shall not be diminished or invalidated by any negligence, act or omission of Debtor. The proceeds of such insurance, at the option of Secured Party, shall be applied toward the replacement or repair of the Collateral or toward payment of the Obligations. Debtor hereby irrevocably appoints Secured Party as its attorney-in-fact and agent to make claim for, adjust, compromise, settle, receive payment of, and to sign all documents, checks and/or drafts in payment of or relating to any claim for loss of or damage to the Collateral and for any returned premiums. If any required insurance expires, is canceled or modified, or is otherwise not in full force and effect, Secured Party may but need not obtain replacement insurance. Secured Party may but need not pay the premiums for insurance and/or replacement insurance and the amount of all premiums so paid by Secured Party shall be added to Debtor's obligations hereunder and shall be reimbursed to Secured Party on demand together with interest thereon at the maximum lawful daily rate, not to exceed 0.0666% per day (but only to the extent permitted by law) from the date paid by Secured Party until fully reimbursed by Debtor.

5. Secured Party shall have the right, at any reasonable time, to inspect all or any portion of the Collateral and/or Debtor's books and records. Debtor shall assist Secured Party in making any such inspection and Debtor shall reimburse Secured Party for its costs and expenses of making up to four such inspections per year. Upon request, Debtor shall, from time to time, furnish a current financial statement to Secured Party in form and content satisfactory to Secured Party, and shall provide annual certified financial statements within five (5) days of Secured Party's request therefor.

6. If Debtor shall fail to fully and timely pay, perform and fulfill any of its Obligations, covenants or agreements to or with Secured Party and/or if Debtor shall breach any of its warranties to Secured Party under this Agreement or otherwise, Secured Party shall have the option, in its sole discretion and without any obligation, to pay, perform, fulfill or cause the payment, performance or fulfillment of same on behalf of Debtor; and all costs and expenses incurred by Secured Party in connection therewith (including but not limited to attorneys' fees, bond premiums, court costs, costs of retaking, storing, preserving, selling and/or realizing on any Collateral) shall be added to the Obligations hereby secured and shall be payable by Debtor to Secured Party upon demand together with interest thereon at the maximum lawful daily rate, not to exceed 0.0666% per day (but only to the extent permitted by law), from the date advanced by Secured Party until fully repaid. Secured Party shall have no obligation to make any demand upon or give any notice to Debtor prior to the exercise of any of its rights under this paragraph; and neither the exercise nor the failure to exercise any such rights by Secured Party shall relieve Debtor of any default or constitute a waiver of Secured Party's right to enforce strict compliance with the terms of this Agreement at any time.

7. Debtor assumes all liability and risk of loss and agrees to defend, indemnify and hold Secured Party harmless from and against all claims, liabilities, causes of action and damages of any kind, including but not limited to injury to or death of any person(s) and for loss, damage or destruction of any property and for any fines, penalties, costs, expenses and charges in any way arising out of or related to the Obligations, this Agreement, the Collateral or any use, possession, storage, maintenance, repair, transportation or operation (including without limitation all costs and expenses of investigation, all attorneys' fees, court costs, arbitration expenses and costs, and all special, consequential, compensatory and punitive damages). Debtor, at its own cost and expense, shall use, operate, maintain, repair, transport and store the Collateral in a safe and careful manner in compliance with all applicable laws, rules and regulations (including without limitation those regulating hazardous substances, the environment and public health or safety), industry standards, insurance requirements and manufacturer's specifications and service bulletins. Debtor also assumes and agrees to indemnify, pay and hold harmless Secured Party and its directors, officers, employees and agents from all expenses, losses, costs, claims, actions, causes of action, damages of any kind, liabilities, expenses and attorneys fees that Secured Party may incur or sustain in obtaining or enforcing payment or performance of any of the Obligations or exercising its rights and remedies under this Agreement or in connection with any action, proceeding or appeal arising out of or related to this Agreement, the Obligations and/or the Collateral, whether brought by Debtor or any third party. The obligations of Debtor under this paragraph shall survive termination of this Agreement.

8. If any Event of Default exists, Secured Party without notice or demand may do one or more of the following, in any order, and such remedies shall be cumulative (none of which shall be exclusive but each is in addition to any other remedy available to Secured Party): (a) Secured Party may accelerate the maturity of the Obligations and declare same to be at once due and payable whereupon they shall be immediately due and payable; (b) Secured Party may require Debtor to pay all accrued interest, late charges, collection charges, reimbursement for any and all expenses incurred by Secured Party in enforcing any of the Obligations or this Agreement and reasonable attorneys' fees; (c) Secured Party may require Debtor to deliver any or all of the Collateral at Debtor's expense to such place or places as Secured Party may designate; (d) Secured Party may repossess/take possession of any or all of the Collateral wherever found, voluntarily or involuntarily, without notice, demand or legal process (Debtor, if permitted by applicable law, hereby waiving any right to notice or a hearing), and Secured Party may enter the premises where any or all Collateral are located and disconnect, render unusable, and remove any or all Collateral without liability to Debtor arising out of such entry, taking of possession or removal, and may use such premises without charge to store or show the Collateral for sale or other disposition; (e) Secured Party may sell the Collateral at public or private sale, hold, retain the Collateral in full or partial satisfaction of the indebtedness due to Secured Party, or otherwise dispose of the Collateral in any manner it chooses, free and clear of any claims or rights of Debtor; and/or (f) Secured Party may sue to enforce Debtor's performance hereof, or may exercise any other right or remedy then available to Secured Party permitted at law or in equity whether or not stated herein. Failure or delay on the part of Secured Party to exercise any right or remedy hereunder shall not operate as a waiver thereof. Debtor agrees that any public or private sale shall be deemed commercially reasonable (i) if notice of any such sale is mailed to Debtor (at the address for Debtor specified herein) at least ten (10) days prior to the date of any public sale or after which any

private sale will occur; (ii) if notice of any public sale is published in a newspaper of general circulation in the county where the sale will occur at least once within the ten (10) days prior to the sale; (iii) whether the items are sold in bulk, singly, or in such lots as Secured Party may elect; (iv) whether or not the items sold are in Secured Party's possession and present at the time and place of sale; and (v) whether or not Secured Party refurbishes, repairs or prepares the items for sale. Secured Party may be the purchaser at any public sale. In all cases, Debtor shall be liable for any deficiency due and owing to Secured Party after any public or private sale, plus all costs, expenses and damages incurred by Secured Party including but not limited to all legal fees whether or not suit is filed, allocable costs of in-house counsel, costs related to the repossession, reconditioning and disposition of the Collateral, and all incidental and consequential damages. No action taken by Secured Party shall release Debtor from any of its obligations to Secured Party. Debtor acknowledges and agrees that in any action or proceeding brought by Secured Party to obtain possession of any Collateral, Secured Party shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking which is hereby waived by Debtor and if Debtor contests Secured Party's right to possession of any Collateral in any action or proceeding Debtor shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Debtor's unpaid obligations to Secured Party, whichever is less. The proceeds of any sale shall first be applied to the costs and expenses of Secured Party including but not limited to recovering, transporting, storing, refurbishing, and/or selling the items sold, attorneys' fees, court costs, bond and insurance premiums, advertising, postage and publishing costs, and sales commissions. Secured Party may without prior notice to or demand upon Debtor and with or without the exercise of any of Secured Party's other rights or remedies, apply toward the payment of Debtor's obligations (at any time owing to Secured Party) any checks, drafts, notes, balances, reserves, accounts and sums belonging to or owing to Debtor and coming into Secured Party's possession and for such purpose may endorse Debtor's name on any instrument or document payable to Debtor (whether for deposit, collection, discount or negotiation). Without notice to Debtor, Secured Party may make such applications or change applications of sums previously paid and/or to be paid to Secured Party, to such Obligations as Secured Party in its sole discretion may choose. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies.

9.  Protest and all demands and notices of any action taken by Secured Party under this Agreement, or in connection with any Collateral, except as otherwise provided in this Agreement, are hereby waived by Debtor, and any indulgence of Secured Party, substitution for, exchange of or release of any person liable for the Obligations is hereby consented to. Debtor waives notice of the creation, advance, increase, existence, extension or renewal of, and of any indulgence with respect to, the Obligations; waives presentment, demand, notice of dishonor, and protest; waives notice of the amount of the Obligations outstanding at any time, notice of any change in financial condition of any person liable for the Obligations or any part thereof, notice of any Event of Default, and all other notices respecting the Obligations; and agrees that maturity of the Obligations or any part thereof may be accelerated, extended or renewed one or more times by Secured Party in its sole discretion, without notice to Debtor. In performing any act under this Agreement or any of the Obligations, time shall be of the essence and Secured Party's acceptance of partial or delinquent payments or performance, or failure or delay to exercise any right or remedy, shall not be a waiver of any obligation of Debtor or right of Secured Party nor constitute a waiver of any subsequent default.

10.  This Agreement, Secured Party's rights hereunder and/or any of the Obligations may be assigned from time to time by Secured Party, and in any such case the assignee shall be entitled to all of the rights, privileges and remedies herein granted to Secured Party; and Debtor hereby waives and agrees not to assert against any assignee any defense, setoff, claim, recoupment or counterclaim Debtor may have against Secured Party or any prior assignee. Debtor shall not assign this Agreement nor any of Debtor's rights or obligations hereunder.

11.  Debtor shall be in default hereunder upon the occurrence of any of the following (each an "Event of Default"): (a) Debtor, or any endorser, guarantor, surety, accommodation party or other person liable for the payment or performance of any of the Obligations ("Other Liable Party") fails to pay when due any sum due to Secured Party (whether hereunder or under any other Obligation to Secured Party) or to timely perform any obligation, covenant, term or provision of this Agreement or any other instrument and/or agreement now or hereafter existing between the parties, or there exists any Event of Default thereunder; (b) any warranty, representation or statement made to Secured Party by or on behalf of Debtor or any Other Liable Party is false in any respect when made or thereafter becomes false or is breached; (c) Debtor's or any Other Liable Party's death, dissolution, termination of existence, insolvency, business failure, assignment for the benefit of creditors, bulk transfer, proceeding under any bankruptcy or insolvency law, being declared judicially incompetent, voluntary or involuntary consent to the appointment of a receiver, trustee, conservator, liquidator or legal guardian for them or any or all of their property; (d) a default under any indebtedness of Debtor or any Other Liable Party or any event permitting the holder of any such indebtedness to accelerate the maturity thereof; whether or not such event is cured; (e) the Collateral becomes, in the sole judgment of Secured Party, unsatisfactory or insufficient in character or value; (f) Secured Party in good faith believes that the prospect of payment or performance of any of the Obligations or this Agreement is impaired; (g) any change in the management, operation, ownership or control of Debtor or any Other Liable Party; (h) any attachment, levy or execution against Debtor and/or any Other Liable Party that is not released within 48 hours; (i) Debtor's or any Other Liable Party's action as change as to, in Secured Party's sole discretion, increase the credit risk involved and Secured Party thereby becomes insecure as to the performance of this Agreement or any other agreement with Debtor or such Other Liable Party; (j) Debtor shall incur, create, assume, cause or suffer to exist any mortgage, trust, lien, security interest, pledge, hypothecation or other encumbrance (other than Secured Party's interest therein) or attachment or execution of any kind whatsoever upon, affecting or with respect to the Collateral, this Agreement, or any of Secured Party's interests under this Agreement or any of the Obligations; (k) Debtor shall sell, pledge, assign, rent, lease, lend, destroy or otherwise transfer or dispose of any Collateral; (l) failure of Debtor to obtain or maintain insurance on the Collateral satisfactory to Secured Party in its sole discretion; or (m) any of the Obligations, this Agreement, the security interest or any provision hereof for any reason attributable to Debtor ceases to be in full force and effect or shall be declared to be null and void or the validity or enforceability thereof shall be contested by Debtor or Debtor shall deny that it has any further liability or obligation thereunder.

12.  The term "Debtor" as used in this Agreement shall be construed as the singular or plural to correspond with the number of persons executing this instrument as Debtor. "Secured Party" and "Debtor" as used in this Agreement include the heirs, executors or administrators, successors, legal representatives, receivers, and assigns of those parties. If more than one person executes this Agreement as Debtor, their obligations under this Agreement shall be joint and several. Unless the context otherwise requires, terms used in this Agreement which are defined in the Uniform Commercial Code are used with the meaning as therein defined. THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. No termination, modification, waiver or amendment of or to this Agreement shall be effective unless in writing signed by Debtor and an officer (assistant vice president or higher) of Secured Party. If any provision of this Agreement is rendered or declared invalid, illegal or ineffective by any existing or subsequently enacted legislation or decision of a court of competent jurisdiction, such legislation or decision shall only invalidate such provision to the extent so rendered or declared invalid, illegal or ineffective and shall not impair, invalidate or nullify the remainder of this Agreement which shall remain in full force and effect. THE PARTIES INTEND THAT THIS AGREEMENT AND EACH OF ITS TERMS BE VALID AND ENFORCEABLE AS WRITTEN AND, ACCORDINGLY, AGREE THAT THE VALIDITY AND ENFORCEABILITY OF THIS AGREEMENT AND EACH OF ITS TERMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DEBTOR'S LOCATION AS SET FORTH IN THIS AGREEMENT, OR, IF ONE OR MORE OF THE TERMS OF THIS AGREEMENT WOULD BE INVALID OR UNENFORCEABLE UNDER THE LAWS OF SUCH STATE, THE LAWS OF THE STATE OF SECURED PARTY'S LOCATION AS SET FORTH IN THIS AGREEMENT.

13.  Any notice or demand to Debtor hereunder or in connection herewith may be given and shall conclusively be deemed and considered to have been given and received upon the deposit thereof in the United States Mail, in writing, duly stamped and addressed to Debtor at the address set forth in this Agreement or at such other address of Debtor as Debtor shall have designated by notice in writing delivered to Secured Party. Actual notice to Debtor, however given or received, shall always be effective. DEBTOR, AS A MATERIAL INDUCEMENT FOR SECURED PARTY TO MAKE LOANS OR OTHER FINANCIAL ACCOMMODATIONS AVAILABLE TO DEBTOR, HEREBY IRREVOCABLY DESIGNATES AND APPOINTS FIRST FEDERAL COMMERCIAL INC., HOUSTON, TEXAS AS ATTORNEY-IN-FACT AND AGENT FOR DEBTOR, AND IN DEBTOR'S NAME, PLACE AND STEAD TO ACCEPT OR WAIVE SERVICE OF ANY PROCESS (AND FOR NO OTHER PURPOSE) WITHIN THE STATE OF TEXAS, SECURED PARTY AGREEING TO GIVE WRITTEN NOTICE OF SUCH SERVICE OR WAIVER TO DEBTOR WITHIN THREE (3) DAYS AFTER SUCH SERVICE WAS EFFECTED OR SUCH WAIVER WAS EXECUTED, BY MAILING SUCH WRITTEN NOTICE TO DEBTOR'S ADDRESS AS SET FORTH ABOVE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED; AGREES TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT LOCATED IN HARRIS COUNTY, TEXAS FOR ALL CLAIMS, CAUSES OF ACTION, COUNTERCLAIMS, AND/OR CROSS-CLAIMS ARISING OUT OF AND/OR RELATED TO THIS AGREEMENT, THE COLLATERAL AND/OR ANY OTHER PRESENT OR FUTURE OBLIGATIONS OF DEBTOR TO SECURED PARTY; EXCEPT THAT ANY ACTION OR PROCEEDING (HOWEVER STYLED) TO OBTAIN POSSESSION OF ANY COLLATERAL OR OTHER SECURITY FOR DEBTOR'S OBLIGATIONS OR TO COLLECT ANY SUM DUE ON THE OBLIGATIONS MAY, IN SECURED PARTY'S SOLE DISCRETION, BE BROUGHT IN ANY STATE OR FEDERAL COURT LOCATED IN THE JURISDICTION WHERE THE SUBJECT OF SUCH ACTION OR PROCEEDING MAY BE SITUATED; WAIVES THE RIGHT TO OBJECT TO OR TRANSFER THE VENUE OF ANY SUCH ACTION OR PROCEEDING; AND CONSENTS AND AGREES THAT SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING BROUGHT IN ACCORDANCE HEREWITH SHALL BE GOOD AND SUFFICIENT IF SENT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO DEBTOR AT HIS, HER OR ITS ADDRESS AS PROVIDED HEREIN. THE PARTIES HEREBY WAIVE ANY AND ALL RIGHTS TO A JURY TRIAL OF ANY CLAIM, CAUSE OF ACTION, COUNTERCLAIM, CROSS-CLAIM, DEFENSE OR OFFSET INVOLVING DEBTOR, SECURED PARTY OR ANY PERSON CLAIMING ANY RIGHT OR INTEREST ACQUIRED FROM, THROUGH OR UNDER ANY OF THEM; AND DEBTOR FURTHER HEREBY WAIVES ANY AND ALL SPECIAL, EXEMPLARY, PUNITIVE AND CONSEQUENTIAL DAMAGES IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT AND/OR THE ACTS OR OMISSIONS OF SECURED PARTY OR ANY ASSIGNEE.

14.  If after receipt of any payment pursuant to any of the Obligations, Secured Party is for any reason compelled to surrender such payment to any person or entity because such payment is determined to be void or voidable as a preference, fraudulent transfer, impermissible set-off or recoupment, a diversion of trust funds, or for any other reason, then such Obligation(s) shall be reinstated, it necessary and shall continue in full force notwithstanding any contrary action which Secured Party or Debtor may have taken in reliance upon such payment. Any such contrary action so taken shall be without prejudice to Secured Party's rights under the Obligations and hereunder and shall be deemed to have been established upon such payment having become final and irrevocable. The terms of paragraphs 1, 7, 10, 12, 13, 14 and 15 shall survive termination of this Agreement.

15.  All agreements between Debtor and Secured Party, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of maturity or otherwise, shall any interest contracted for, charged or received by Secured Party exceed the maximum amount permissible under applicable law. If, from any circumstance whatsoever, interest would otherwise be payable to Secured Party in excess of the maximum lawful amount, the interest payable to Secured Party shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Secured Party shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of any principal and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of any principal, such excess shall be refunded to Debtor. All interest paid or agreed to be paid to Secured Party shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of any principal (including the period of any renewal or extension) so that the interest for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between Debtor and Secured Party.

WITNESS (Attest if a corporation):       DEBTOR:    Wolper Construction, Inc.

_____   BY: _____

_____ (Title)   BY: _____  (Title)

Subscribed and sworn to before me, the undersigned notary public, on the date above written.

BY: _____

Notary public _____   _____ (Title)

COPYRIGHT 2001 FINANCIAL FEDERAL CREDIT INC.                    FFCI SAGA I (04/03)

## SCHEDULE "A"

This schedule is attached to and becomes part of the Security Agreement, Installment Sale Contract, or Lease Agreement, dated January 28, 2004, between the undersigned.

| QUANTITY | YEAR & MODEL | DESCRIPTION OF PROPERTY | SERIAL NUMBER |
|---|---|---|---|
| One (1) | 375 | Caterpillar Hydraulic Excavator with stick, boom and bucket | 1JM00427 |

Including all attachments and accessories and all proceeds, rental proceeds, accounts and chattel paper arising out of or related to the sale, rental or other disposition thereof.

**"AS THIS IS REPOSSESSED EQUIPMENT, IT IS SOLD AS-IS, WHERE-IS, WITHOUT ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, AND SPECIFICALLY DISCLAIMING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE."**

This schedule is hereby verified correct and undersigned Buyer(s), Lessee(s), or Debtor(s) acknowledges receipt of a copy.

Seller, Lessor, Secured Party:                    Buyer, Lessee, Debtor:

Financial Federal Credit Inc.                       Wolper Construction, Inc.

By:_____              By:_____

SA/ScASpec (4/03)

# PROMISSORY NOTE

| $383,472.00 | Salt Lake City | UT | June 21, 2005 |
|---|---|---|---|
| (Total of Note) | (City) | (State) | (Date) |

FOR VALUE RECEIVED, Wolper Construction, Inc. and L. E. Equipment Rental Company, LLC, Jointly and Severally ("Maker") promises to pay to the order of Financial Federal Credit Inc. ("Holder"), at 1300 Post Oak Blvd, Suite 1300, Houston, TX 77056, or such other place as Holder may, from time to time, designate in writing, the amount of three hundred eighty-three thousand four hundred seventy-two and 00/100 Dollars ($383,472.00), payable in consecutive monthly installments, as follows:

| | installments, each in the amount of | | |
|---|---|---|---|
| 36 | installments, each in the amount of | $ 10,652.00 | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | ; then |
| | installments, each in the amount of | $ | |

Said consecutive **monthly** installments shall commence on the **21st** day of **July, 2005**, and continue on the same day of each month thereafter until the indebtedness evidenced hereby is paid in full; with interest from the date hereof being payable on the unpaid principal amount at the maturity of each installment at the rate of ------ percent (----%) per annum (but in no event shall such rate exceed any maximum permitted by applicable law). Maker shall also pay to Holder on demand, on each installment (of principal and/or interest) not fully paid prior to the fifth day (or such longer period as required by law) after its due date, a late charge equal to the maximum percentage of such overdue installment legally permitted as a late charge, not to exceed five percent (5%); and after maturity of the entire indebtedness (whether by acceleration or otherwise), Maker shall pay, on demand, interest on the unpaid indebtedness (excluding unpaid late charges) at the maximum lawful daily rate, but not to exceed 0.0666% per day, until paid in full. Interest shall be calculated on the basis of a 360 day year and for the actual number of days elapsed, unless such calculation would cause the effective interest rate under this Note to exceed the maximum rate allowed by applicable law, in which case such calculation shall be on the basis of a 365 day year.

Upon nonpayment when due of any amount owing hereunder, or if default occurs under any security agreement, pledge, assignment, deed of trust, or any instrument or document executed to evidence, secure, guarantee, govern or in any way pertain to the loan evidenced by this Note, Holder may, at its option, without notice or demand, accelerate the maturity of the indebtedness then outstanding under this Note and declare same to be at once due and payable whereupon it shall be and become immediately due and payable. Maker, all endorsers, guarantors and any other party liable on this Note also promise and agree to pay Holder's costs, expenses and reasonable attorneys' fees incurred in enforcing and/or collecting this Note. Maker, all endorsers, guarantors and any other party liable on this Note waive presentment for payment, demand, protest, notice of protest and notice of nonpayment, default and dishonor, notice of intent to accelerate, notice of acceleration, and further, to the extent allowed by law, waive all benefits of valuation, appraisement and exemption laws. Holder may, without notice, extend the time of payment of this Note, postpone the enforcement hereof, grant any other indulgence, add or release any party primarily or secondarily liable hereon and/or release or change any collateral securing this Note without affecting or diminishing Holder's right of recourse against Maker, all endorsers, guarantors and other parties liable on this Note, which right is hereby expressly reserved. As used in this Note, the term "Holder" includes any future holder of this Note. If more than one person signs this Note, the obligations of each of them shall be joint and several.

As a material inducement to Holder to advance funds or otherwise provide financial accommodations to or for the benefit of Maker and/or in consideration of Holder having previously done so, it is agreed that Maker shall not, unless otherwise required by law, have any right to voluntarily prepay any indebtedness for borrowed money now or hereafter owing to Holder (whether evidenced hereby or otherwise); provided, however, that Maker may (unless otherwise expressly agreed in writing) have the privilege of voluntarily prepaying any such indebtedness in full or in part at any time or from time to time if Maker shall: (i) give seven days' prior written notice to Holder specifying the principal amount and date of any proposed voluntary prepayment and the indebtedness being voluntarily prepaid; (ii) pay the amount specified in such voluntary prepayment notice, in good funds, on the date specified in such notice; (iii) simultaneously pay, in good funds, all principal, interest and other charges accrued and/or due to Holder through the date of any such voluntary prepayment; and (iv) simultaneously pay a prepayment premium equal to the sum of (a) fifteen hundredths percent (0.15%) of the principal amount then being voluntarily prepaid multiplied by the number of whole or partial calendar months between the date of such voluntary prepayment and the scheduled final maturity date of the indebtedness being prepaid, plus (b) two percent (2%) of the principal amount of the indebtedness then being voluntarily prepaid, but not more than the maximum permitted by law. The principal amount of any voluntary partial prepayment shall be applied to the scheduled installments of the indebtedness then being prepaid in the reverse order of their respective maturities, so that the amount and due date of only the latest maturing installment(s) shall be affected thereby.

Notwithstanding anything to the contrary in this Note or any related writing, all agreements between Maker and Holder, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of the maturity hereof or otherwise, shall the interest contracted for, charged or received by Holder exceed the maximum amount which has not otherwise accrued on the date of such acceleration, and Holder does not intend to charge or collect any unearned interest in the event of acceleration. If, from any circumstance whatsoever, interest would otherwise be payable to Holder in excess of the maximum lawful amount, the interest payable to Holder shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Holder shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of the principal hereof, such excess shall be refunded to Maker. All interest paid or agreed to be paid to Holder shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of the principal (including the period of any extension or renewal hereof) so that the interest hereon for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between Maker and Holder.

The proceeds from the loan evidenced by this Note are to be used for business purposes only, and no part thereof is to be used for primarily consumer, personal, family or household purposes.

COPYRIGHT 1996 FINANCIAL FEDERAL CREDIT INC.

FFCI FORM.LIB/PN144 (4/02)

THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. THIS NOTE MAY NOT BE CHANGED OR TERMINATED ORALLY.

CO-MAKER     L. E. Equipment Rental Company, LLC          MAKER     Wolper Construction, Inc.

By:  _____ manager            By:  _____ president
                                    Title                                            Title

_____
(Witness for Maker and Co-Maker)

## ENDORSEMENT

The undersigned do each (jointly and severally) unconditionally guarantee the prompt payment of the within Note at maturity or any time thereafter, or on default prior thereto, hereby waiving presentment for payment, demand, protest, notice of protest, notice of dishonor and notice of every kind and nature, and accepting all of its provisions and authorizing Holder, without notice to any one or more or all of us, to substitute debtors, and/or to grant one or more extensions in whole or in part, and/or to receive security or additional security for the payment hereof and/or to surrender, release or substitute any such security.

If any payment on this Note is not paid when due, then the remaining unpaid indebtedness shall, without notice or demand, become immediately due and payable, at the option of Holder, and may be recovered in any suit brought by the Holder of this Note against any one or more or all of us, at the option of Holder, whether such suit has been commenced against Maker or not, and in any such suit Maker may be joined with one or more or all of us, at the option of Holder.

The Holder of this Note shall not be required to look to any security given or held for the payment of this Note, but may proceed against any one or more or all of us immediately upon a default in payment or otherwise. Any execution may be immediately levied upon any real or personal property of the undersigned, all rights of the undersigned to have personal property last taken and sold under such execution being hereby expressly waived.

_____
(Endorser)

_____
(Endorser)

_____
(Endorser)

COPYRIGHT 1996 FINANCIAL FEDERAL CREDIT INC.                    FFCI FORMLT8/PN14 (4/03)

## SECURITY AGREEMENT

| | | | |
|---|---|---|---|
| This Security Agreement dated | June 21, 2005 | , is by | Wolper Construction, Inc. and L. E. Equipment Rental Company, LLC, |

Jointly and Severally ("Debtor") whose principal office (or residence) address is

3750 West 500 South, Salt Lake City, UT, 84104 in favor of

Financial Federal Credit Inc. ("Secured Party") whose address is

1300 Post Oak Blvd, Suite 1300, Houston, TX, 77056

1. To secure the payment and performance of all indebtedness, obligations and liabilities of Debtor to Secured Party of whatever kind, whether previously, contemporaneously, or subsequently incurred or created, whether direct or acquired from third parties, whether contingent or fixed, and whether of the same or different classes (including, without limiting the generality of the foregoing, all indebtedness, obligations and liabilities arising out of or relating to (i) advances, payments, loans, endorsements, guaranties, extensions of credit, financial accommodations and/or benefits granted or extended by Secured Party to or for the account of Debtor, (ii) notes, security agreements, lease agreements, rental agreements, installment sale contracts, bailment agreements, guaranties, and/or any other present or future agreements between Debtor and Secured Party, and/or (iii) expenses, charges, commissions and/or interest owing by Debtor to Secured Party or chargeable to Debtor by Secured Party], and all extensions, renewals and/or modifications of the foregoing (collectively, the "Obligations"), Debtor does hereby assign, transfer, pledge and grant to Secured Party a security interest/lien in/upon all property listed on any Schedule to this Agreement (the "Property"), and in all goods, inventory, equipment, accounts, accounts receivable, documents, instruments, chattel paper, contract rights, general intangibles, investment property, securities entitlements, deposit accounts, fixtures and other property, wherever located, now or hereafter belonging to Debtor or in which Debtor has any interest, and in all proceeds, insurance proceeds, substitutions, replacement parts, additions and accessions of and/or to all of the foregoing (collectively, including the Property, the "Collateral"). Debtor and Secured Party acknowledge that Secured Party may (but shall not be obligated to) make future loans or extensions of credit to Debtor, refinance existing Obligations of Debtor, or purchase from third parties loans or indebtedness of Debtor, and Secured Party and Debtor agree that the Collateral shall be security for any and all such indebtedness.

2. Debtor hereby represents and warrants to Secured Party and covenants and agrees with Secured Party as follows: (a) All information supplied and statements made to Secured Party by or on behalf of Debtor relating to the Obligations or the Collateral are and shall be true, complete and accurate, whether supplied prior to, contemporaneously with or subsequent to the execution of this Agreement; (b) Debtor has good and marketable title to the Collateral, free and clear of any liens, security interests or encumbrances of any kind or nature whatsoever (except any claimed by Secured Party) and Debtor will warrant and defend the Collateral against all claims; (c) all Collateral listed on any Schedule to this Agreement is in Debtor's possession at the location shown above, unless a different location is disclosed on such Schedule for any item, and shall at all times remain in Debtor's possession and control; (d) Debtor shall not change (i) its name, (ii) the location of any Collateral, or (iii) the location of (as applicable) Debtor's residence, principal place of business, executive office or the place where Debtor keeps its business records, without thirty (30) days prior written notice to Secured Party; (e) Debtor has full, unrestricted and lawful power and authority to sell and assign the Collateral, to grant Secured Party a security interest/lien therein/thereon as herein provided and to execute and perform this Agreement and all other instruments and agreements executed by Debtor in favor of Secured Party; (f) if a corporation, a partnership, or a limited liability company, Debtor is (as applicable: (i) duly formed, organized, validly existing and in good standing in the state of its incorporation or organization, (ii) duly qualified and in good standing in every jurisdiction where the nature of its business requires it to be so qualified, and (iii) authorized by all requisite action of its stockholders and directors, general partners or managers to execute, deliver and perform this Agreement; (g) Debtor will cause Secured Party to have a security interest and lien in/upon the Collateral which at all times shall be duly perfected, enforceable and superior to any liens, encumbrances and interests other than Secured Party's, and Debtor shall not permit the Collateral or any portion thereof to be or become subject to any lien or encumbrance of any kind or nature whatsoever (except any claimed by Secured Party), nor shall Debtor sell, pledge, grant any security interest in, encumber, assign, rent, lease, lend, destroy or otherwise transfer or dispose of, or permit the filing of a financing statement with respect to (other than in favor of Secured Party) any Collateral, nor shall Debtor guarantee any obligation of any other person or entity except in favor of Secured Party, without the prior written consent of Secured Party in each instance; (h) Debtor shall comply (to the extent necessary to protect the Collateral and Secured Party's interest therein) with the provisions of all leases, mortgages, deeds of trust or other contracts affecting any premises where any Collateral is or may be located and with any rules, laws, orders, ordinances or statutes of any state, county, municipality or other authority having jurisdiction relating to such premises and/or the conduct of business thereon and/or use thereof; (i) Debtor shall, at Debtor's sole cost and expense, keep and maintain all Collateral in good condition and repair, and shall use and maintain the Collateral in accordance with all applicable manufacturer's specifications and warranties; (j) all Collateral shall at all times remain personalty and shall not become part of any realty to which it may be attached so that Secured Party shall have the unrestricted right (subject only to the terms of this Agreement) to remove all or any portion thereof from any premises where it may be located, and Debtor will obtain and deliver to Secured Party (in a form acceptable to Secured Party) appropriate waivers from landlords, mortgagees and owners of such premises; (k) Debtor shall (at Debtor's expense) upon request by Secured Party, obtain, execute and deliver all assignments, certificates, financing statements or other documents, give further assurances and do all other acts and things as may be necessary to fully perfect Secured Party's interest in the Collateral and to protect, enforce or otherwise effectuate the terms of this Agreement; and (l) Secured Party has no obligation to lend or advance funds unless and until all representations, warranties, conditions and requirements contained herein have been satisfied including without limitation receipt by Secured Party of proof of ownership of the Collateral satisfactory to Secured Party in its sole discretion, and any applicable subordinations and/or lien releases as may be required by, and in a form acceptable to, Secured Party in its sole discretion. Debtor hereby irrevocably designates and appoints Secured Party as Debtor's agent and attorney-in-fact to sign and deliver all such assignments, certificates, financing statements and other documents necessary to perfect, protect, continue and/or enforce Secured Party's interest in the Collateral and to file same with the appropriate office(s). Debtor hereby authorizes Secured Party to file a financing statement in all appropriate locations.

3. Debtor hereby acknowledges the validity of and affirms all of the Obligations, agrees that they are and shall be secured by this Agreement and absolutely and unconditionally agrees to punctually and fully pay and perform all Obligations. Debtor shall pay to Secured Party on demand, on any installment of the Obligations not fully paid prior to the fifth day (or such longer period as required by law) after its due date, a late charge equal to the maximum percentage of such overdue installment legally permitted as a late charge, not to exceed five percent (5%); and after maturity of the entire unpaid indebtedness (whether by acceleration or otherwise) of any one or more of the Obligations, Debtor shall pay, on demand, interest on such matured indebtedness (excluding unpaid late charges) at the maximum lawful daily rate, but not to exceed 0.0666% per day, until paid in full.

4. Debtor shall insure the Collateral against all risks of loss or damage from every cause (including without limitation fire, theft, vandalism, accident, flood, earthquake and extended coverage) for not less than the full replacement value as determined by Secured Party in its sole discretion, and shall carry liability and property damage insurance covering the Collateral. All insurance shall be in form and amount and with licensed, solvent companies approved by Secured Party, and shall name Secured Party as sole loss payee. Debtor shall pay the premiums therefor and deliver said policies or duplicates to Secured Party. Each insurer shall agree by endorsement upon the policy or policies issued by it or by independent instrument furnished to Secured Party (in 30 days prior written notice before the policy shall be modified or canceled and that Secured Party's coverage shall not be diminished or invalidated by any negligence, act or omission of Debtor. The proceeds of such insurance, at the option of Secured Party, shall be applied toward the replacement or repair of the Collateral or toward payment of the Obligations. Debtor hereby irrevocably appoints Secured Party as its attorney-in-fact and agent to make claim for, adjust, compromise, settle, receive payment of, and to sign all documents, checks or drafts in payment of or relating to any claim for loss of or damage to the Collateral and for any returned premiums. If any required insurance expires, is canceled or modified, or is otherwise not in full force and effect, Secured Party may but need not obtain replacement insurance. Secured Party may but need not pay the premiums for insurance and/or replacement insurance and the amount of all premiums so paid by Secured Party shall be added to Debtor's obligations hereunder and shall be reimbursed to Secured Party on demand together with interest thereon at the maximum lawful daily rate, not to exceed 0.0666% per day (but only to the extent permitted by law) from the date paid by Secured Party until fully reimbursed by Debtor.

5. Secured Party shall have the right, at any reasonable time, to inspect any or any portion of the Collateral and/or any portion of Secured Party's books and records. Debtor shall assist Secured Party in making any such inspection and Debtor shall reimburse Secured Party for its costs and expenses of making up to four such inspections per year. Upon request, Debtor shall, from time to time, furnish a current financial statement to Secured Party in form and content satisfactory to Secured Party, and shall provide annual certified financial statements within five (5) days of Secured Party's request therefor.

6. If Debtor shall fail to fully and timely pay, perform and fulfill any of its Obligations, covenants or agreements to or with Secured Party and/or if Debtor shall breach any of its warranties to Secured Party under this Agreement or otherwise, Secured Party shall have the option, in its sole discretion and without any obligation, to pay, perform, fulfill or cause the payment, performance or fulfillment of same on behalf of Debtor; and all costs and expenses incurred by Secured Party in connection therewith (including but not limited to attorneys' fees, bond premiums, court costs, costs of retaking, storing, preserving, selling and/or realizing on any Collateral) shall be added to the Obligations hereby secured and shall be payable by Debtor to Secured Party upon demand together with interest thereon at the maximum lawful daily rate, not to exceed 0.0666% per day (but only to the extent permitted by law), from the date advanced by Secured Party until fully repaid. Secured Party shall have no obligation to make any demand upon or give any notice to Debtor prior to the exercise of any of its rights under this paragraph; and neither the exercise nor the failure to exercise any such rights by Secured Party shall relieve Debtor of any default or constitute a waiver of Secured Party's right to enforce strict compliance with the terms of this Agreement at any time.

7. Debtor assumes all liability and risk of loss and agrees to defend, indemnify and hold Secured Party harmless from and against all claims, liabilities, causes of action and damages of any kind, including but not limited to injury to or death of any person(s) and/or loss, damage or destruction of any property and for any fines, penalties, costs, expenses and charges in any way arising out of or related to the Obligations, this Agreement, the Collateral or its use, possession, storage, maintenance, repair, transportation or operation (including without limitation all costs and expenses of investigation, all attorneys' fees, court costs, arbitration expenses and costs, and all special, consequential, compensatory and punitive damages). Debtor, at its own cost and expense, shall use, operate, maintain, repair, transport and store the Collateral in a safe and careful manner in compliance with all applicable laws, rules and regulations (including without limitation those regulating hazardous substances, the environment and public health or safety), industry standards, insurance requirements and manufacturer's specifications and service bulletins. Debtor also assumes and agrees to indemnify, pay and hold harmless Secured Party and its directors, officers, employees and agents from all expenses, losses, costs, claims, actions, causes of action, damages of any kind, liabilities, expenses and attorneys fees that Secured Party may incur or sustain in obtaining or enforcing payment or performance of any of the Obligations and/or exercising its rights and remedies under this Agreement or in connection with any action, proceeding or appeal arising out of or related to this Agreement, the Obligations and/or the Collateral, whether brought by Debtor or any third party. The obligations of Debtor under this paragraph shall survive termination of this Agreement.

8. If any Event of Default exists, Secured Party without notice or demand may do one or more of the following, in any order, and such remedies shall be cumulative (none of which shall be exclusive but each is in addition to any other remedy available to Secured Party): (a) Secured Party may accelerate the maturity of the Obligations and declare same to be at once due and payable whereupon they shall be immediately due and payable; (b) Secured Party may require Debtor to pay all accrued interest, late charges, collection charges, reimbursement for any and all expenses incurred by Secured Party in enforcing any of the Obligations or this Agreement and reasonable attorneys' fees; (c) Secured Party may require Debtor to deliver any or all of the Collateral at Debtor's expense to such place or places as Secured Party may designate; (d) Secured Party may repossess/take possession of any or all of the Collateral wherever found, voluntarily or involuntarily, without notice, demand or legal process (Debtor, if permitted by applicable law, hereby waiving any right to notice or a hearing), and Secured Party may enter the premises where any or all Collateral are located and disconnect, render unusable, and remove any or all Collateral without liability to Debtor arising out of such entry, taking or possession or removal, and may use such premises without charge to store or show the Collateral for sale or other disposition; (e) Secured Party may sell the Collateral manner it chooses, free and clear of any claims or rights of Debtor; and/or (f) Secured Party may sue to enforce Debtor's performance hereof, or may exercise any other right or remedy then available to Secured Party permitted at law or in equity whether or not stated herein. Failure or delay on the part of Secured Party to exercise any right or remedy hereunder shall not operate as a waiver thereof. Debtor agrees that any public or private sale shall be deemed commercially reasonable (i) if notice of any such sale is mailed to Debtor (at the address for Debtor specified herein) at least ten (10) days prior to the date of any public sale or after which any

COPYRIGHT 2001 FINANCIAL FEDERAL CREDIT INC.

FFCI FORM-UR/SA 1 (2/04)

private sale will occur; (ii) if notice of any public sale is published in a newspaper of general circulation in the county where the sale will occur at least once within the ten (10) days prior to the sale; (iii) whether the items are sold in bulk, singly, or in such lots as Secured Party may elect; (iv) whether or not the items sold are in Secured Party's possession and present at the time and place of sale; and (v) whether or not Secured Party refurbishes, repairs or prepares the items for sale. Secured Party may be the purchaser at any public sale. In all cases, Debtor shall be liable for any deficiency due and owing to Secured Party after any public or private sale, plus all costs, expenses and damages incurred by Secured Party including but not limited to all legal fees whether or not suit is filed, allocable costs of in-house counsel, costs related to the repossession, reconditioning and disposition of the Collateral, and all incidental and consequential damages. No action taken by Secured Party to release Debtor from any of its obligations to Secured Party, Debtor acknowledges and agrees that in any action or proceeding brought by Secured Party to obtain possession of any Collateral, Secured Party shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking which is hereby waived by Debtor to obtain such possession. Debtor contests Secured Party's right to possession of any Collateral in any action or proceeding Debtor shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Debtor's unpaid obligations to Secured Party, whichever is less. The proceeds of any sale shall first be applied to the costs and expenses of Secured Party including but not limited to recovering, transporting, storing, refurbishing, and/or selling the items sold, attorneys' fees, court costs, bond and insurance premiums, advertising, postage and publishing costs, and sales commissions. Secured Party may without prior notice to or demand upon Debtor and with or without the exercise of any of Secured Party's other rights or remedies, apply toward the payment of Debtor's obligations (at any time owing to Secured Party) any checks, drafts, notes, balances, reserves, accounts and sums belonging to or owing to Debtor and coming into Secured Party's possession and for such purpose may endorse Debtor's name on any instrument or document payable to Debtor (whether for deposit, collection, discount or negotiation). Without notice to Debtor, Secured Party may make such applications or change applications of sums previously paid and/or to be paid to Secured Party, to such Obligations as Secured Party in its sole discretion may choose. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies.

**9.** Protest and all demands and notices of any action taken by Secured Party under this Agreement, or in connection with any Collateral, except as otherwise provided in this Agreement, are hereby waived by Debtor, and any indulgence of Secured Party, substitution for, exchange of or release of any person liable on the Obligations is hereby consented to. Debtor waives notice of the creation, advance, increase, existence, extension or renewal of, and of any indulgence with respect to, the Obligations; waives presentment, demand, notice of dishonor, and protest; waives notice of the amount of the Obligations outstanding at any time, notice of any change in financial condition of any person liable for the Obligations or any part thereof, notice of any Event of Default, and all other notices respecting the Obligations; and agrees that maturity of the Obligations or any part thereof may be accelerated, extended or renewed one or more times by Secured Party in its sole discretion, without notice to Debtor. In performing any act under this Agreement or any of the Obligations, time shall be of the essence and Secured Party's acceptance of partial or delinquent payments or performance, or failure or delay to exercise any right or remedy, shall not be a waiver of any obligation of Debtor or right of Secured Party nor constitute a waiver of any subsequent default.

**10.** This Agreement, Secured Party's rights hereunder and/or any of the Obligations may be assigned from time to time by Secured Party, and in any such case the assignee shall be entitled to all of the rights, privileges and remedies herein granted to Secured Party, and Debtor hereby waives and agrees not to assert against any assignee any defense, setoff, claim, recoupment or counterclaim Debtor may have against Secured Party or any prior assignee. Debtor shall not assign this Agreement nor any of Debtor's rights or obligations hereunder.

**11.** Debtor shall be in default hereunder upon the occurrence of any of the following (each an "Event of Default"): (a) Debtor or any endorser, guarantor, surety, accommodation party or other person liable for the payment or performance of any of the Obligations ("Other Liable Party") fails to pay when due any sum due to Secured Party (whether hereunder or under any other Obligation to Secured Party) or to timely perform any obligation, covenant, term or provision of this Agreement or any other instrument and/or agreement now or hereafter existing between the parties, or there exists any Event of Default thereunder; (b) any warranty, representation or statement made to Secured Party by or on behalf of Debtor or any Other Liable Party is false in any respect when made or thereafter becomes false or is breached; (c) Debtor's or any Other Liable Party's death, dissolution, termination of existence, insolvency, business failure, assignment for the benefit of creditors, bulk transfer, proceeding under any bankruptcy or insolvency law, being declared judicially incompetent, voluntary or involuntary consent to the appointment of a receiver, trustee, conservator, liquidator or legal guardian for them or any or all of their property; (d) a default under any indebtedness of Debtor or any Other Liable Party or any event permitting the holder of any such indebtedness to accelerate the maturity thereof, whether or not such event is cured; (e) the Collateral becomes, in the sole judgment of Secured Party, unsatisfactory or insufficient in character or value; (f) Secured Party in good faith believes that the prospect of payment or performance of any of the Obligations or this Agreement is impaired; (g) any change in the management, operation, ownership or control of Debtor or any Other Liable Party; (h) any attachment, levy or execution against Debtor and/or any Other Liable Party that is not released within 48 hours; (i) Debtor's or any Other Liable Party's affairs so change as to, in Secured Party's sole discretion, increase the credit risk involved and Secured Party thereby becomes insecure as to the performance of this Agreement or any other agreement with Debtor or such Other Liable Party; (j) Debtor shall incur, create, assume, cause or suffer to exist any mortgage, trust, lien, security interest, pledge, hypothecation or other encumbrance (other than Secured Party's interest therein) or attachment or execution of any kind whatsoever upon, affecting or with respect to the Collateral, this Agreement, or any of Secured Party's interests under this Agreement or any of the Obligations; (k) Debtor shall sell, pledge, assign, rent, lease, lend, destroy or otherwise transfer or dispose of any Collateral; (l) failure of Debtor to obtain or maintain insurance on the Collateral satisfactory to Secured Party in its sole discretion; or (m) any of the Obligations, this Agreement, the security interest or any provision hereof for any reason attributable to Debtor ceases to be in full force and effect or shall be declared to be null and void or the validity or enforceability thereof shall be contested by Debtor or Debtor shall deny that it has any further liability or obligation thereunder.

**12.** The term "Debtor" as used in this Agreement shall be construed as the singular or plural to correspond with the number of persons executing this instrument as Debtor. "Secured Party" and "Debtor" as used in this Agreement include the heirs, executors or administrators, successors, legal representatives, receivers, and assigns of those parties. If more than one person executes this Agreement as Debtor, their obligations under this Agreement shall be joint and several. Unless the context otherwise requires, terms used in this Agreement which are defined in the Uniform Commercial Code are used with the meaning as therein defined. THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. No termination, modification, waiver or amendment of or to this Agreement shall be effective unless in writing signed by Debtor and an officer (assistant vice president or higher) of Secured Party. If any provision of this Agreement is rendered or declared invalid, illegal or ineffective by any existing or subsequently enacted legislation or decision of a court of competent jurisdiction, such legislation or decision shall only invalidate such provision to the extent so rendered or declared invalid, illegal or ineffective and shall not impair, invalidate or nullify the remainder of this Agreement which shall remain in full force and effect. THE PARTIES INTEND THAT THIS AGREEMENT AND EACH OF ITS TERMS BE VALID AND ENFORCEABLE AS WRITTEN AND, ACCORDINGLY, AGREE THAT THE VALIDITY AND ENFORCEABILITY OF THIS AGREEMENT AND EACH OF ITS TERMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DEBTOR'S LOCATION AS SET FORTH IN THIS AGREEMENT, OR, IF ONE OR MORE OF THE TERMS OF THIS AGREEMENT WOULD BE INVALID OR UNENFORCEABLE UNDER THE LAWS OF SUCH STATE, THE LAWS OF THE STATE OF SECURED PARTY'S LOCATION AS SET FORTH IN THIS AGREEMENT.

**13.** Any notice or demand to Debtor hereunder or in connection herewith may be given and shall conclusively be deemed and considered to have been given and received upon the deposit thereof in the U.S. Mail, in writing, duly stamped and addressed to Debtor at the address set forth in this Agreement or at such other address of Debtor as Debtor shall have designated by notice in writing delivered to Secured Party. Actual notice to Debtor, however given or received, shall always be effective. DEBTOR, AS A MATERIAL INDUCEMENT FOR SECURED PARTY TO MAKE LOANS OR OTHER FINANCIAL ACCOMMODATIONS AVAILABLE TO DEBTOR, HEREBY IRREVOCABLY DESIGNATES AND APPOINTS FIRST FEDERAL COMMERCIAL INC., HOUSTON, TEXAS AS ATTORNEY-IN-FACT AND AGENT FOR DEBTOR, AND IN DEBTOR'S NAME, PLACE AND STEAD TO ACCEPT OR WAIVE SERVICE OF ANY PROCESS (AND FOR NO OTHER PURPOSE) WITHIN THE STATE OF TEXAS, SECURED PARTY AGREEING TO GIVE WRITTEN NOTICE OF SUCH SERVICE OR WAIVER TO DEBTOR WITHIN THREE (3) DAYS AFTER SUCH SERVICE WAS EFFECTED OR SUCH WAIVER WAS EXECUTED, BY MAILING SUCH WRITTEN NOTICE TO DEBTOR'S ADDRESS AS SET FORTH ABOVE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED; AGREES TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT LOCATED IN HARRIS COUNTY, TEXAS FOR ALL CLAIMS, CAUSES OF ACTION, COUNTERCLAIMS, AND/OR CROSS-CLAIMS ARISING OUT OF AND/OR RELATED TO THIS AGREEMENT, THE COLLATERAL AND/OR ANY OTHER PRESENT OR FUTURE OBLIGATIONS OF DEBTOR TO SECURED PARTY; EXCEPT THAT ANY ACTION OR PROCEEDING (HOWEVER STYLED) TO OBTAIN POSSESSION OF ANY COLLATERAL OR OTHER SECURITY FOR DEBTOR'S OBLIGATIONS OR TO COLLECT ANY SUM DUE ON THE OBLIGATIONS MAY, IN SECURED PARTY'S SOLE DISCRETION, BE BROUGHT IN ANY STATE OR FEDERAL COURT LOCATED IN THE JURISDICTION WHERE THE SUBJECT OF SUCH ACTION OR PROCEEDING MAY BE SITUATED; WAIVES THE RIGHT TO OBJECT TO OR TRANSFER THE VENUE OF ANY SUCH ACTION OR PROCEEDING, AND CONSENTS AND AGREES THAT SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING BROUGHT IN ACCORDANCE HEREWITH SHALL BE GOOD AND SUFFICIENT IF SENT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO DEBTOR AT HIS, HER OR ITS ADDRESS AS PROVIDED HEREIN. THE PARTIES HEREBY WAIVE ANY AND ALL RIGHTS TO A JURY TRIAL OF ANY CLAIM, CAUSE OF ACTION, COUNTERCLAIM, CROSS-CLAIM, DEFENSE OR OFFSET INVOLVING DEBTOR, SECURED PARTY OR ANY PERSON CLAIMING ANY RIGHT OR INTEREST ACQUIRED FROM, THROUGH OR UNDER ANY OF THEM; AND DEBTOR FURTHER HEREBY WAIVES ANY AND ALL SPECIAL, EXEMPLARY, PUNITIVE AND CONSEQUENTIAL DAMAGES IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT AND/OR THE ACTS OR OMISSIONS OF SECURED PARTY OR ANY ASSIGNEE.

**14.** If after receipt of any payment pursuant to any of the Obligations, Secured Party is for any reason compelled to surrender such payment to any person or entity because such payment is determined to be void or voidable as a preference, fraudulent transfer, impermissible set off or recoupment, a diversion of trust funds, or for any other reason, then such Obligation(s) shall be reinstated, if necessary and shall continue in full force notwithstanding any contrary action which Secured Party or Debtor may have taken in reliance upon such payment. Any such contrary action so taken shall be without prejudice to Secured Party's rights under the Obligations and hereunder and shall be deemed to have been conditioned upon such payment having become final and irrevocable. The terms of paragraphs 1, 7, 10, 12, 13, 14 and 15 shall survive termination of this Agreement.

**15.** All agreements between Debtor and Secured Party, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of maturity or otherwise, shall any interest contracted for, charged or received by Secured Party exceed the maximum amount permissible under applicable law. If, from any circumstance whatsoever, interest would otherwise be payable to Secured Party in excess of the maximum lawful amount, the interest payable to Secured Party shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Secured Party shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of any principal and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of any principal, such excess shall be refunded to Debtor. All interest paid or agreed to be paid to Secured Party shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of any principal (including the period of any renewal or extension) so that the interest for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between Debtor and Secured Party.

| WITNESS (Attest if a corporation): | DEBTOR: | Wolper Construction, Inc. |
|---|---|---|
| | | |
| (Title) | BY: | President (Title) |

Subscribed and sworn to before me, the undersigned notary public, on the date above written.

DEBTOR: **L. E. Equipment Rental Company, LLC**

Notary public

BY:

COPYRIGHT 2001 FINANCIAL FEDERAL CREDIT INC.

FFCI FORM/LB/SA 1 (2/04)

**SCHEDULE A**

Page 1 of 1

This schedule is attached to and becomes part of the Security Agreement, Installment Sale, Contract, or Equipment Lease Agreement, dated <u>June 21, 2005</u>, between the undersigned.

| QTY | MAKE | MODEL | DESCRIPTION | SERIAL NO. |
|-----|------|-------|-------------|------------|
| One (1) | Freightliner | FLD | 7-Axle Super 18 Dump Truck | 1FVNFEDB3XPF66417 |
| One (1) | Freightliner | FLD | 7-Axle Super 18 Dump Truck | 1FVNFEDB5YPF66419 |
| One (1) | Mack | Granite Series | 5-Axle Dump Truck with 1/2 Round Bed | 1M2AG10C32M001604 |
| One (1) | Clement | | 4-Axle Dump Truck Pup | 5C2DD18D65M004445 |

Including all attachments and accessories and all proceeds, rental proceeds, accounts and chattel paper arising out of or related to the sale, rental, or other disposition thereof.

This schedule is hereby verified correct and undersigned Buyer(s), Lessee(s), or Debtor(s) acknowledges receipt of a copy

Buyer, Lessee, Debtor:
**Wolper Construction, Inc.**

By:

Buyer, Lessee, Debtor:
**L. E. Equipment Rental Company, LLC**

By:

**FINANCIAL FEDERAL CREDIT INC. ("Lessor")**   **LEASE AGREEMENT ("LEASE")**   LEASE NO. _____

| Wolper Construction, Inc. | ("Lessee") | See Attached Schedule B | ("Supplier") |
| (Legal Name) | | (Legal Name) | |

3750 West 500 South
(Mailing Address)                                        (Mailing Address)

Salt Lake City, UT 84104
(City or Town, State & Zip)                              (City or Town, State & Zip)

Lessee hereby leases from Lessor the goods described below or on any schedule hereto (the 'Property') subject to the terms and conditions set forth herein.

Description of Property (quantity, make, year, model, serial number, other identification):   ; including all attachments and accessories
See attached Schedule 'A' for Property description

Location of Property (if different from Lessee's address above): 3750 West 500 South, Salt Lake City , UT, 84104

| NO. OF INSTALLMENTS "INITIAL TERM" | | AMOUNT OF EACH INSTALLMENT | | TOTAL RENT | ADVANCE INSTALLMENT | DUE DATE OF SECOND INSTALLMENT |
|---|---|---|---|---|---|---|
| 42 | 41 | at $ 27,913.00 | followed by | | | |
| | 1 | at $ -27,913.00 | $ | 1,159,746.00 | $ 0.00 | 7/12/2006 |
| | | (Plus Taxes) | | (Plus Taxes) | (Plus Taxes) | |

THE UNDERSIGNED HEREBY AGREE TO ALL TERMS AND CONDITIONS APPEARING ABOVE AND ON THE REVERSE SIDE OF THIS LEASE.
LESSEE ACKNOWLEDGES RECEIPT OF A SIGNED, TRUE AND EXACT COPY OF THIS LEASE.

ACCEPTED AT:           DATE: 6.20.06       LESSEE: Wolper Construction, Inc.        DATE: June 12, 2006

Financial Federal Credit Inc.

By: _____                     By: _____ Name: _____ (Title)

By: _____                     By: _____ Name: _____ (Title)

COPYRIGHT 2005 FINANCIAL FEDERAL CREDIT INC.

9. **Insurance.** Lessee shall insure the Property against all risks of loss or damage from every cause (including without limitation fire, theft, vandalism, accident, flood, earthquake and extended coverage) for not less than the full replacement value as determined by Lessor in its sole discretion and shall carry liability and property damage insurance covering the Property. All insurance shall be in form and amount and with licensed, solvent companies approved by Lessor, and shall name Lessor as co-insured and sole loss payee. Lessee shall pay the premiums therefor and deliver said policies or duplicates to Lessor. Each insurer shall agree by endorsement upon the policy or policies issued by it or by independent instrument furnished to Lessor to give Lessor 30 days prior written notice before the policy shall be modified or canceled and that Lessor's coverage shall not be diminished or invalidated by any negligence, act or omission of Lessee. The proceeds of such insurance, at the option of Lessor, shall be applied toward the replacement or repair of the Property or toward payment of the obligations of Lessee hereunder. Lessee hereby irrevocably appoints Lessor its attorney-in-fact and agent to make claim for, adjust, compromise, settle, receive payment of, and to sign all documents, checks and/or drafts in payment of or relating to any claim for loss of or damage to the Property and for any returned premiums. If any required insurance expires, is canceled or modified, or is otherwise not in full force and effect, Lessor may but need not obtain replacement insurance. Lessor may but need not pay the premiums for insurance and/or replacement insurance and the amount of all premiums so paid by Lessor shall be added to Lessee's obligations hereunder and shall be reimbursed to Lessor on demand together with interest thereon at the maximum lawful daily rate, not to exceed 0.0666% per day (but only to the extent permitted by law) from the date paid by Lessor until fully reimbursed by Lessee. Lessor shall have the right at any time to inspect all or any portion of the Property and/or Lessee's books and records and Lessee shall assist any such inspection. If Lessor shall determine that any Property is being used or maintained in violation of the terms hereof, Lessor may: (a) immediately retake possession of the Property without the necessity of declaring this Lease in default and such retaking shall not constitute an election of remedies or preclude the exercise of any of Lessor's other rights or remedies or (b) declare an event of default and exercise any of its rights and remedies under this Lease. Lessee will furnish annual and interim financial statement(s) to Lessor prepared in accordance with generally accepted accounting principles satisfactory to Lessor.

10. **Events of Default.** Lessee shall be in default hereunder upon the occurrence of any of the following (each an 'Event of Default'): (a) Lessee or any endorser, guarantor, surety, accommodation party or other person liable for the payment or performance of any of Lessee's obligations to Lessor ('Other Liable Party') fails to pay when due any sum due to Lessor (whether hereunder or under any other obligation to Lessor) or to timely perform any obligation, covenant, term or provision of this Lease or any other instrument and/or agreement now or hereafter existing between the parties, or there exists any Event of Default thereunder; (b) any warranty, representation or statement made to Lessor by or on behalf of Lessee or any Other Liable Party is false in any respect when made or thereafter becomes false or is breached; (c) Lessee's or any Other Liable Party's death, dissolution, termination of existence, insolvency, business failure, assignment for the benefit of creditors, bulk transfer, proceeding under any bankruptcy or insolvency law, being declared judicially incompetent, voluntary or involuntary consent to the appointment of a receiver, trustee, conservator, liquidator or legal guardian for them or any or all of their property; (d) a default under any indebtedness of Lessee or any Other Liable Party or any event permitting the holder of any such indebtedness to accelerate the maturity thereof, whether or not such event is cured; (e) the Property becomes, in the sole judgment of Lessor, unsatisfactory or insufficient in character or value; (f) Lessor in good faith believes that the prospect of payment or performance of this Lease is impaired; (g) any change in the management, operation, ownership or control of Lessee or any Other Liable Party; (h) any attachment, levy or execution against Lessee and/or any Other Liable Party that is not released within 48 hours; (i) Lessee's or any Other Liable Party's affairs so change as to, in Lessor's sole discretion, increase the credit risk involved and Lessor thereby becomes insecure as to the performance of this Lease or any other agreement with Lessee or such Other Liable Party; (j) Lessee shall purport to sell, pledge, assign, rent, lease, lend, destroy or otherwise transfer or dispose of any Property or Additional Collateral; (k) Lessee shall incur, create, assume, cause or suffer to exist any mortgage, trust, lien, security interest, pledge, hypothecation or other encumbrance (other than Lessor's interest therein) or authorize or execute of any kind whatsoever upon, affecting or with respect to the Property, Additional Collateral, this Lease, or any of Lessor's interests under this Lease or any other obligation due and payable to Lessor; (l) failure of Lessee to obtain or maintain insurance on the Property satisfactory to Lessor in its sole discretion; or (m) this Lease, the security interest or any provision hereof for any reason attributable to Lessee ceases to be in full force and effect or shall be declared to be null and void or the validity or enforceability hereof shall be contested by Lessee or Lessee shall deny that it has any further liability or obligation hereunder.

11. **Remedies.** If any Event of Default exists, Lessor without notice or demand may do one or more of the following, in any order, and such remedies shall be cumulative (none of which shall be exclusive but each is in addition to any other remedy available to Lessor): (a) Lessor may accelerate the maturity of the indebtedness due hereunder and declare same to be at once due and payable whereupon it shall be immediately due and payable; (b) Lessor may require Lessee to pay all accrued interest, late charges, collection charges, reimbursements for any and all expenses incurred by Lessor in enforcing this Lease and foreclosing on any Property or Additional Collateral and Lessee's expense to such place or places as Lessor may designate; (c) Lessor may repossess/take possession of any or all of the Property and/or Additional Collateral wherever found, voluntarily or involuntarily, without notice, demand or legal process (Lessee, if permitted by applicable law, hereby waiving any right to notice or a hearing), and Lessor may enter the premises where any or all Property and Additional Collateral are located and disconnect, render unusable, and remove any or all Property and Additional Collateral without liability to Lessee arising out of such entry, taking of possession or removal, and may use such premises without charge to store or show the Property and Additional Collateral for sale, re-lease, or other disposition (all of Lessee's rights in the Property or Additional Collateral shall be absolutely extinguished upon any such retaking but Lessor's obligations shall not be discharged until all indebtedness payable hereunder is fully paid); and Lessor may keep all installments previously paid; (e) if Lessor does not recover possession of the Property or Additional Collateral, Lessor may require Lessee to pay Lessor as liquidated damages for loss of benefit of its bargain and not as a penalty, the balance of not due to the expiration of the initial term hereof plus 5% of the Real Cost of the Property plus either the amount of any purchase option granted by Lessor to Lessee, or, if there is no purchase option, the greater of the fair market value of the Property or the residual value of the Property as recorded on Lessor's books, which amount shall be deemed conclusive; (f) if Lessor recovers the Property or any Additional Collateral, Lessor may sell it by public or private sale, re-lease, hold, retain in full or partial satisfaction of the indebtedness due to Lessor, or otherwise dispose of the Property or Additional Collateral in any manner it chooses, free and clear of any claims or rights of Lessee; (g) Lessor may recover for Agreed Value, as defined in section 7 hereof, of all the Property; and/or (h) Lessor may terminate this Lease, may sue to enforce Lessee's performance hereof, and/or may exercise any other right or remedy then available to Lessor under applicable law or in equity whether or not stated herein. Failure or delay on the part of Lessor to exercise any right or remedy hereunder shall not operate as a waiver thereof. In all cases, Lessee shall be liable for any deficiency due and owing to Lessor after any public or private sale, plus all costs, expenses and damages incurred by Lessor including but not limited to all legal fees whether or not suit is filed, allocable costs of in-house counsel, costs related to the repossession, reconditioning and disposition of the Property and Additional Collateral, and all incidental and consequential damages. No action taken by Lessor shall release Lessee from any of its obligations to Lessor; Lessee acknowledges and agrees that in any action or proceeding brought by Lessor to obtain possession of any Property or Additional Collateral, Lessor shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking which is hereby waived by Lessee and if Lessee contests Lessor's right to possession of any Property or Additional Collateral in any action or proceeding Lessee shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Lessee's unpaid obligations to Lessor, whichever is less. The proceeds of any sale or re-letting shall first be applied to the costs and expenses of Lessor including but not limited to recovering, transporting, storing, refurbishing, selling and/or reletting the items sold or relet, attorneys' fees, court costs, bond and insurance premiums, advertising, postage and publishing costs, and sales commissions. Lessor may without prior notice to or demand upon Lessee and with or without the exercise of any of Lessor's other rights or remedies, apply toward the payment of Lessee's obligations (at any time owing to Lessor) any checks, drafts, notes, balances, reserves, accounts and sums belonging to or owing to Lessee and coming into Lessor's possession and for such purpose may endorse Lessee's name on any instrument or document payable to Lessee (whether for deposit, collection, discount or negotiation). Without notice to Lessee, Lessor may make such applications and/or change applications of sums previously paid and/or to be paid to Lessor, to such obligations of Lessee to Lessor (whether hereunder or otherwise) as Lessor in its sole discretion may choose. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies.

12. **Return of Property.** Lessee shall not, without Lessor's prior written consent, modify, improve and/or affix attachments to the Property, but any such modifications, improvements and attachments made with or without Lessor's consent shall immediately become part of the Property and be owned by Lessor. Lessee shall, at Lessee's sole cost and expense, upon the expiration or earlier termination of any term of this Lease, immediately return all Property in good condition and repair (ordinary wear and tear excepted) by delivering same to such location(s) as may be designated by Lessor. Upon Lessor's request, at the expiration or earlier termination of this Lease, Lessee will store the Property for Lessor (at no cost to Lessor). If upon the expiration of any term hereof or after demand, Lessor does not for any reason immediately receive possession of all Property in the condition required hereby, Lessee shall pay to Lessor for the use and/or retention of the Property or any item thereof the Monthly Renewal Rent for each subsequent month or portion thereof, and all other provisions of this Lease shall remain in effect until all Property has been returned to Lessor.

13. **Taxes.** Unless otherwise agreed in writing, Lessee shall (a) deposit with Lessor monthly 1/12 of the estimated annual amount of all foreign, federal, state and local taxes, assessments, and charges now or hereafter due or imposed upon the Property or upon the possession, use, ownership, leasing or renting of the Property (all herein called 'Property Taxes') as estimated by Lessor; and (b) unless prohibited by law, pay to Lessor an annual tax accounting fee of $500 to compensate Lessor for its administrative costs and expenses of collection and payment of Property Taxes, preparation and filing of tax returns, and related bookkeeping. The first annual tax accounting fee plus an initial deposit equal to three months of the estimated annual Property Taxes shall be paid to Lessor upon execution of this Lease and thereafter 1/12 of the estimated annual Property Taxes and the tax accounting fee shall be paid to Lessor monthly on the date specified herein for payment of installments. Lessor shall not be required to obtain any bond or post other security in connection with deposits of Property Taxes and unless otherwise required by law, no interest shall accrue or be due on such deposits. If such deposits should at any time be insufficient to pay the Property Taxes when due, Lessee shall pay the deficiency to Lessor immediately upon demand. If Lessee undertakes to file all Property Tax returns and timely pay all sums shown as due thereon and Lessor agrees to permit Lessee to do so, Lessee hereby agrees to indemnify and hold Lessor harmless from and against any and all real or claimed violations and pay all expenses, costs, interest, penalties, charges and damages of every kind arising therefrom and/or related thereto. Lessor shall have no liability to Lessee for failure to make such payments to the applicable taxing authorities.

14. **Sale.** Lessee agrees that any public or private sale shall be deemed commercially reasonable (i) if notice of any such sale is mailed to Lessee (at the address for Lessee specified in this Lease or in any other agreement now or hereafter held by Lessor) at least 10 days prior to the date of any public sale or after which any private sale will occur; (ii) if notice of any public sale is published in a newspaper of general circulation in the county where the sale will occur at least once within the 10 days prior to the sale; (iii) whether the items are sold in bulk, singly, or in such lots as Lessor may elect; (iv) whether or not the items sold are in Lessor's possession and present at the time and place of sale; and (v) whether or not Lessor refurbishes, repairs or prepares the items for sale. Lessor may be the purchaser of the Property or Additional Collateral at any public sale.

15. **Severability.** All of Lessee's agreements to indemnify and hold Lessor harmless shall survive the expiration or earlier termination of this Lease. "Lessee" shall be construed as the singular or plural to correspond with the number of persons executing this Lease as Lessee. "Lessor" and "Lessee" shall include the heirs, executors or administrators, successors, legal representatives, receivers and assigns of those parties. If more than one person executes this lease as Lessee, their obligations shall be joint and several. Unless otherwise defined herein, any term used in this Lease shall have the meaning as defined in the UCC. If any provision of this Lease is rendered or declared invalid, illegal or ineffective by any existing or subsequently enacted legislation or decision of a court of competent jurisdiction, such legislation or decision shall only invalidate such provision to the extent so rendered or declared invalid, illegal or ineffective in such jurisdiction only and shall not impair, invalidate or nullify the remainder of this Lease which shall remain in full force and effect. THE PARTIES INTEND THAT THIS LEASE AND EACH OF ITS TERMS BE VALID AND ENFORCEABLE AS WRITTEN AND, ACCORDINGLY, AGREE THAT THE VALIDITY AND ENFORCEABILITY OF THIS LEASE AND EACH OF ITS TERMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF LESSEE'S LOCATION AS SET FORTH IN THIS LEASE OR, IF ONE OR MORE OF THE TERMS OF THIS LEASE WOULD BE INVALID OR UNENFORCEABLE UNDER THE LAWS OF SUCH STATE, THE LAWS OF THE STATE WHOSE LESSOR ACCEPTS THIS LEASE.

16. **Jurisdiction/Venue/Appointment of Agent.** All notices related hereto shall be in writing and personally delivered to an officer, partner or proprietor (as applicable) of the party receiving such notice or mailed to such party by regular mail or certified mail, return receipt requested, to the address for such party specified above or to such other address as may have been designated by such party by written notice delivered or mailed in the manner specified herein. LESSEE, AS A MATERIAL INDUCEMENT FOR LESSOR TO ENTER INTO THIS LEASE, HEREBY: IRREVOCABLY DESIGNATES AND APPOINTS THE TEXAS SECRETARY OF STATE AS ATTORNEY-IN-FACT AND AGENT FOR LESSEE AND IN LESSEE'S NAME, TO ACCEPT SERVICE OF ANY PROCESS WITHIN THE STATE OF TEXAS; AGREES THAT THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT LOCATED IN HARRIS COUNTY, TEXAS, REGARDING ANY MATTER ARISING HEREUNDER, PROVIDED THAT LESSOR MAY BRING SUIT IN ANY OTHER COURT HAVING JURISDICTION; WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS AND ANY OBJECTION TO VENUE OF ANY SUCH ACTION OR PROCEEDING; WAIVES THE RIGHT TO TRANSFER THE VENUE OF ANY SUCH ACTION OR PROCEEDING; AND CONSENTS AND AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING BROUGHT IN ACCORDANCE HEREWITH SHALL BE GOOD AND SUFFICIENT IF SENT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO LESSEE AT LESSEE'S ADDRESS AS PROVIDED HEREIN. THE PARTIES HEREBY WAIVE ANY AND ALL RIGHTS TO A JURY TRIAL OF ANY CLAIM, CAUSE OF ACTION, COUNTERCLAIM, CROSS-CLAIM, DEFENSE OR OFFSET INVOLVING LESSEE, LESSOR OR ANY PERSON CLAIMING ANY RIGHT OR INTEREST ACQUIRED FROM, THROUGH OR UNDER ANY OF THEM; AND LESSEE FURTHER HEREBY WAIVES ANY AND ALL SPECIAL, EXEMPLARY, PUNITIVE AND CONSEQUENTIAL DAMAGES IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT AND/OR THE ACTS OR OMISSIONS OF LESSOR OR ANY ASSIGNEE. The headings of each numbered paragraph herein are for convenience only and shall not affect the meaning or construction hereof.

17. **Usury.** All agreements between Lessee and Lessor whether now existing or hereafter arising, whether written or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of the maturity or otherwise, shall any interest contracted for, charged or received by Lessor exceed the maximum amount permissible under applicable law. If from any circumstance whatsoever, interest would otherwise be payable to Lessor in excess of the maximum lawful amount, the interest payable to Lessor shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Lessor shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of any principal and not to the payment of interest or if such excessive interest exceeds the unpaid balance of any principal, such excess shall be refunded to Lessee. All interest paid or agreed to be paid to Lessor shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of any principal (including the period of any renewal or extension) so that the interest for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between the parties.

18. **Article 2A.** If the Property is not properly installed or is unsatisfactory for any reason, Lessee shall nevertheless pay all rent and other sums due under this Lease and shall not set up any such claim, cause of action, counterclaim, offset or recoupment to Lessee's obligations hereunder. Lessee hereby waives all rights granted by Lessor under Sections 508 through 522 of Article 2A (or a local counterpart) of the UCC (including but not limited to any right to cancel this Lease, reject and/or revoke acceptance of the Property, extract partial delivery, sue for damages, cover, obtain specific performance, or otherwise).

19. **Prepayment.** Unless otherwise required by law, Lessee may, only with Lessor's prior written consent, voluntarily prepay all or part of the obligations outstanding hereunder by giving 7 days prior written notice thereof and paying to Lessor in immediately available funds on the date specified in such notice an amount equal to the Agreed Value, as defined in section 7 hereof, of the specific items of Property being prepaid, but in no event more than the total of the aggregate of unpaid installments plus either the purchase option or the residual value of the Property according to Lessor's records, plus all applicable taxes.

20. **Final Agreement or Merger.** THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. The terms of this Lease may not be waived, altered, amended, modified, revoked or rescinded and all other prior or contemporaneous oral and written representations are merged herein. This is the final expression of this agreement between the parties. Any agreements to modify this Lease must be in writing and signed by Lessee and Lessor, or else (assistant vice president or higher) of Lessor and no attempt at oral modification or rescission of this Lease will be binding or enforceable as a matter of law. By execution of this provision, Lessee agrees to be bound by the terms of this Lease and to the extent applicable, this any provision requiring a separately signed document, pursuant to UCC section 2A-208, has been complied with. If Lessor sells the Property, it will be sold by quit-claim bill of sale, "as-is", "where-is", without any representations or warranties of any kind including without limitation, without any warranty of merchantability or of fitness for a particular purpose, and with all faults.

21. **Reinstatement.** If Lessor is for any reason compelled to surrender any payment received pursuant to this Lease, because such payment is determined to be void or voidable as a preference, fraudulent transfer, impermissible set off or recoupment, a diversion of trust funds, or for any other reason, then this Lease and Lessee's obligations intended to be paid by such payment shall be reinstated, if necessary, and shall continue in full force notwithstanding any contrary action which Lessor or Lessee may have taken in reliance upon such payment. Any contrary action so taken shall be without prejudice to Lessor's rights under this Lease and shall be deemed to have been conditioned upon such payment having become final and irrevocable. The terms of paragraphs 6, 7, 12, 16, 17, 18 and 21 shall survive the termination of this Lease.

COPYRIGHT 2005 FINANCIAL FEDERAL CREDIT INC.

SCHEDULE "A"

This schedule is attached to and becomes part of a certain Lease Agreement dated June 12, 2006.

| QUANTITY | YEAR | MODEL | DESCRIPTION OF COLLATERAL | SERIAL NUMBER |
|----------|------|-------|---------------------------|---------------|
| One (1) | | D155AX-5 | KOMATSU Crawler Tractor | 76388 |
| One (1) | 2006 | F750 | FORD Oil & Lube Truck equipped with IMT 13' Sitestar mobile lubrication unit SN: LUBE061031 | 3FRXF75H46V384484 |
| One (1) | 2007 | F750 | FORD Service Truck Equipped with IMT Dominator II Heavy Duty Steel Crane Body SN: DOM2S2061048, IMT 6025 Heavy Duty Field Service Crane SN: 6025S2061211, IMT DA435HA Hydraulic Air Compressor SN: THP-20152-1105 | 3FRNF65TX7V418712 |
| One (1) | | TA40 | TEREX Articulated Dump Truck | A8421054 |
| One (1) | | TA40 | TEREX Articulated Dump Truck | A8421044 |

Including all attachments, accessions and accessories to, and all proceeds of, all of the foregoing, including without limitation all insurance proceeds and all rental proceeds, accounts and chattel paper arising out of or related to the sale, lease, rental or other disposition thereof.

This schedule is hereby verified correct and the undersigned acknowledge receipt of a copy.

Lessor:
Financial Federal Credit Inc.

By: _____
    Name and Title:

Lessee:
Wolper Construction, Inc.

By: _____    PRESIDENT
    Name and Title:

Lessee:

By: _____
    Name and Title:

Page 1 of 1                                          CommercSchSpec (11/04)

## SCHEDULE "B"

This schedule is attached to and becomes part of Lease Agreement dated <u>June 12, 2006</u>, between the undersigned.

Newman Tractor, LLC.
2841 Verona Rd.
Verona, KY  41092

AG Truck
1220 S. Legacy View St.
Salt Lake City, UT  84127

Komatsu Equipment
2350 West 1500 South
Salt Lake City, UT  84104

Lessor:                                                  Lessee:
Financial Federal Credit Inc.                            Wolper Construction, Inc.

BY: _____                             BY: _____

## LEASE EXTENSION

DATE:     October 30, 2007

RE:     LEASE AGREEMENT dated June 12, 2006, as may have been amended or extended from time to time (the "Lease")
Original/Assignee LESSOR:     FINANCIAL FEDERAL CREDIT INC.
LESSEE:     Wolper Construction, Inc.
ACCOUNT NO:     38336

Lessee hereby: (i) acknowledges being indebted to Lessor in the amount of $626,000.00, which represents the remaining unpaid balance of rent under the Lease, including any extension fees; and (ii) requests that the Lease be modified, amended and extended so that the rental installments (exclusive of applicable sales tax) scheduled thereunder shall be payable as follows:

36 successive monthly installments commencing on the 15th day of November, 2007, and continuing on the same day of each month

thereafter until paid in full. The first 2 installments shall each be in the amount of $7,000.00, followed by 33 installments each in the

amount of $18,000.00, plus applicable taxes, and the final installment shall be in the amount of $18,000.00, plus applicable taxes.

Lessee shall pay to Lessor on demand, on each installment not fully paid prior to the fifth day (or such longer period as required by law) after its due date, a late charge equal to the maximum percentage of such overdue installment legally permitted as a late charge, not to exceed five percent (5%); and after maturity of the entire indebtedness (whether by acceleration or otherwise), Lessee shall pay, on demand, interest on the unpaid indebtedness (excluding unpaid late charges) at the maximum lawful daily rate, but not to exceed 0.0666% per day, until paid in full

As a material inducement for, and in consideration of, Lessor's agreement to this Lease Extension (this "Extension"), Lessee acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Lessee, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of Lessor in accordance with the rental payment schedule set forth above, at Lessor's office or at such other place of payment as Lessor may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Lease, the entire unpaid indebtedness shall, at Lessor's option, become immediately due and payable, and Lessor may enforce all of its rights and remedies under the Lease as fully as if this Extension had never been entered into. As further consideration for Lessor's agreement to the terms of this Extension, Lessee hereby assigns, transfers, pledges and grants to Lessor a security interest in all goods, inventory, equipment, accounts, accounts receivable, documents, instruments, chattel paper, contract rights, general intangibles, investment property, securities entitlements, deposit accounts, fixtures and other property, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Lease and/or this Extension (the "Property"), together with all proceeds, insurance proceeds, substitutions, replacement parts, additions and accessions of and/or to all of the foregoing, to secure the payment, performance, and/or fulfillment of all obligations of Lessee to Lessor, whether now existing or hereafter incurred. Lessee further acknowledges, warrants and agrees that legal title to and/or a first lien upon the Property is and will continue to be vested in Lessor, its successors and assigns, until Lessee has fully paid and performed all obligations to Lessor, with any interest that may accrue thereon, whether under the Lease or otherwise. Lessee hereby authorizes Lessor to file a financing statement in all appropriate locations. Any promissory note made and delivered by Lessee to Lessor in connection with this Extension shall be deemed evidence of the obligations described herein, and not payment thereof until such time as any such note is fully collected by Lessor. Lessor's agreement to this Extension shall not diminish or prejudice Lessor's rights or alter Lessor's position under the Lease. Except as expressly modified in this Extension, all terms, conditions and provisions of the Lease shall remain valid and binding, enforceable and in full force and effect.

As a further inducement for Lessor to agree to this Extension, it is agreed that unless otherwise required by law, Lessee may, only with Lessor's prior written consent, prepay all or part of the obligations outstanding hereunder by giving 7 days prior written notice thereof and paying to Lessor in immediately available funds on the date specified in such notice an amount equal to the sum of (i) 5% of the Real Cost of all Property, plus (ii) the Present Value of the unpaid total rent, plus (iii) either the amount of any purchase option granted by Lessor to Lessee, or, if there is no purchase option, the greater of the fair market value of the Property or the residual value of the Property as recorded on Lessor's books, which amount shall be deemed conclusive, plus (iv) all applicable taxes, and multiplying the resultant sum by a fraction, the numerator of which is the Real Cost of the particular item of Property and the denominator of which is the Real Cost of all items of Property, but in no event more than the total of the aggregate of unpaid installments plus the purchase option, or, if there is no purchase option, the greater of the fair market value of the Property or the residual value of the Property as recorded on Lessor's books, and all applicable taxes. "Present Value" is the value as of the proposed payment date of the unpaid total rent discounted at a rate (the "Discount Rate") equal to the lesser of 5% per annum or the Federal Reserve Primary Credit Discount Rate in effect on the date of the Lease. Lessee agrees that the Discount Rate has been freely negotiated between Lessor and Lessee as a commercially reasonable rate. Upon payment in full of the sum specified above, in good funds, Lessor will quitclaim to Lessee, on an "as-is", "where-is" basis, all of Lessor's right, title and interest in and to the items of Property so prepaid, without any representations or warranties, express or implied (and specifically disclaiming, without limitation, any warranties of merchantability or fitness for a particular purpose). "Real Cost" as to any item of Property means the actual invoice amount charged by the Supplier for such item plus taxes, delivery, freight, installation, set-up and other charges, if any.

In the event any proceeding under any bankruptcy or insolvency law is commenced by or against Lessee or any other party liable on the Lease, Lessee unconditionally and irrevocably agrees (i) not to object or otherwise oppose a motion by FFCI to lift the automatic stay under section 362 of the United States Bankruptcy Code or any similar or equivalent provision of applicable law, (ii) that FFCI shall be entitled to immediate relief from the automatic stay so as to take possession of the Property described in the Lease and to exercise its rights and remedies under the terms of the Lease and applicable non-bankruptcy law without delay, (iii) that sufficient cause exists to grant FFCI relief from the automatic stay, including but not limited to the lack of adequate protection of FFCI's interests, (iv) that Lessee has no equity in the Property, (v) that the Property is not necessary to an effective reorganization of Lessee, and (vi) that any bankruptcy or similar proceeding in which Lessee fails to honor any of the above agreements shall be deemed to have been commenced in bad faith to frustrate the exercise of FFCI's rights and remedies under the Lease and at law. The terms of this paragraph shall survive the Lease and any default thereunder.

Lessee unconditionally and irrevocably stipulates and agrees that Lessee shall have no right to assert any claim or to commence any action or proceeding against FFCI as a result of, arising out of, or in any way related to the Lease, the Property or this Extension more than six (6) months after such claim or cause of action shall accrue.

LESSEE:     Wolper Construction, Inc.

By: _____     _____
                                (Title)

ACCEPTED AND AGREED TO:
FINANCIAL FEDERAL CREDIT INC.

By: _____     _____
                                (Title)



Division Of Corporations

# Acknowledgement of Filing

File Number:272822200538
Old File Number:N/A

Record Date:06-23-2005 12:07
Lapse Date:06-23-2010 12:07

Type:UCC
Status:ACTIVE

**Filer:**
FINANCIAL FEDERAL CREDIT, INC.
1300 POST OAK BLVD., SUITE 300
HOUSTON,TX 77056 USA

**Collateral Description:**
Action: ADD
Description:
ALL ASSETS, INCLUDING WITHOUT LIMITATION ALL PROPERTY DESCRIBED BELOW OR ANY SCHEDULE HERTO,
TOGETHER WITH ALL ATTACHMENTS, ACCESSIONS AND ACCESSORIES THERETO, AND ALL PROCEEDS THEREOF.
SEE ATTACHED SCHEDULE "A"

**Debtor:**
WOLPER CONSTRUCTION, INC.
3750 WEST 600 SOUTH
SALT LAKE CITY,UT 84104 USA

Jurisdiction: UTAH
Organization ID: UT 1395953-0142
Organization Type: CORP

**Debtor:**
L. E. EQUIPMENTS RENTAL COMPANY, LLC
3750 WEST 600 SOUTH
SALT LAKE CITY,UT 84104 USA

Jurisdiction: UTAH
Organization ID: UT 5017785-0160
Organization Type: LLC

**Secured Party:**
FINANCIAL FEDERAL CREDIT, INC.
1300 POST OAK BLVD., SUITE 300
HOUSTON,TX 77056 USA

**Transaction Detail:**
Form Type:UCC 1 FILING STATEMENT
Effective Date:06-23-2005 12:07
Submitter Ref:01-28947/505412 UCC-1 Cac\TH)

Transaction Cost: $12.00
Receipt Number:1500010
Alt Designation:NONE

**Additional Description:**
FILING APPROVED - 67
THE DATA LISTED ABOVE IS A 'NON-CERTIFIED' RECORD.PLEASE TAKE THE TIME TO REVIEW ALL OF THE
INFORMATION.IF YOU FIND ANY DISCREPANCIES YOU MUST CONTACT THE DIVISION, AT NO COST, WITHIN
30 DAYS OF RECEIVING THIS ACKNOWLEDGEMENT.



Division Of Corporations

## Acknowledgement of Filing

File Number:288259200641  Record Date:02-13-2006 16:14  Type:UCC
Old File Number:N/A    Lapse Date:02-13-2011 16:14  Status:ACTIVE

---

**Filer:**

  FINANCIAL FEDERAL CREDIT INC.
  1300 POST OAK BLVD., SUITE 1300
  HOUSTON,TX 77056 USA

Amendment Type: TERMINATION BY SECURED PARTY
**Transaction Detail:**
Form Type:UCC 3 FILING AMENDMENT      Transaction Cost: $
Effective Date:08-04-2006 9:29        Receipt Number:
Submitter Ref:38336/507062 WOLPER CONSTRUCTION,INC. _ex/_ TH Alt Designation:NONE

---

**Additional Description:**
**FILING APPROVED - 3**
THE DATA LISTED ABOVE IS A 'NON-CERTIFIED' RECORD.PLEASE TAKE THE TIME TO REVIEW ALL OF THE
INFORMATION.IF YOU FIND ANY DISCREPANCIES YOU MUST CONTACT THE DIVISION, AT NO COST, WITHIN
30 DAYS OF RECEIVING THIS ACKNOWLEDGEMENT.



Division Of Corporations

# Acknowledgement of Filing

| | | |
|---|---|---|
| File Number:297005200633 | Record Date:06-14-2006 9:42 | Type:UCC |
| Old File Number:N/A | Lapse Date:06-14-2011 9:42 | Status:ACTIVE |

**Filer:**

FINANCIAL FEDERAL CREDIT INC.
1300 POST OAK BLVD. SUITE 1300
HOUSTON,TX 77056 USA

**Collateral Description:**
Action: ADD
Description:
ALL ASSETS NOW OWNED OR HEREAFTER ACQUIRED, INCLUDING WITHOUT LIMITATION ALL PROPERTY
DESCRIBED BELOW OR ON ANY SCHEDULE HERETO, TOGETHER WITH ALL ATTACHMENTS, ACCESSIONS AND
ACCESSORIES THERETO, AND ALL PROCEEDS THEREOF.

**Debtor:**
WOLPER CONSTRUCTION, INC.                           Jurisdiction: UTAH
3750 WEST 500 SOUTH                     Organization ID: UT 1395953-0142
SALT LAKE CITY,UT 84104 USA                  Organization Type: CORP
**Secured Party:**
FINANCIAL FEDERAL CREDIT INC.
1300 POST OAK BLVD. SUITE 1300
HOUSTON,TX 77056 USA
**Transaction Detail:**
Form Type:UCC 1 FILING STATEMENT                Transaction Cost: $12.00
Effective Date:06-14-2006 9:42                    Receipt Number:1810980
Submitter Ref:01-38336 JGU P *m8 567062(vs)*        Alt Designation:NONE

**Additional Description:**
FILING APPROVED - 63

THE DATA LISTED ABOVE IS A 'NON-CERTIFIED' RECORD.PLEASE TAKE THE TIME TO REVIEW ALL OF THE
INFORMATION.IF YOU FIND ANY DISCREPANCIES YOU MUST CONTACT THE DIVISION, AT NO COST, WITHIN
30 DAYS OF RECEIVING THIS ACKNOWLEDGEMENT.



Division Of Corporations

# Acknowledgement of Filing

**File Number:**297007200635      **Record Date:**06-14-2006 9:42      **Type:**UCC
**Old File Number:**N/A      **Lapse Date:**06-14-2011 9:42      **Status:**ACTIVE

**Filer:**

FINANCIAL FEDERAL CREDIT INC.
1300 POST OAK BLVD. SUITE 1300
HOUSTON,TX 77056 USA

**Collateral Description:**
Action: ADD
Description:
ALL ASSETS NOW OWNED OR HEREAFTER ACQUIRED, INCLUDING WITHOUT LIMITATION ALL PROPERTY
DESCRIBED BELOW OR ON ANY SCHEDULE HERETO, TOGETHER WITH ALL ATTACHMENTS, ACCESSIONS AND
ACCESSORIES THERETO, AND ALL PROCEEDS THEREOF.

**Debtor:**
WOLPER CONSTRUCTION, INC.                          Jurisdiction: UTAH
3750 WEST 500 SOUTH                     Organization ID: UT 1395953-0142
SALT LAKE CITY,UT 84104 USA                     Organization Type: CORP

**Secured Party:**
FINANCIAL FEDERAL CREDIT INC.
1300 POST OAK BLVD. SUITE 1300
HOUSTON,TX 77056 USA

**Transaction Detail:**
Form Type:UCC 1 FILING STATEMENT                 Transaction Cost: $12.00
Effective Date:06-14-2006 9:42                     Receipt Number:1810980
Submitter Ref:01-38336 JGU A $m\beta 507062\,(\not{v}5)$     Alt Designation:NONE

**Additional Description:**

FILING APPROVED - 63

THE DATA LISTED ABOVE IS A 'NON-CERTIFIED' RECORD.PLEASE TAKE THE TIME TO REVIEW ALL OF THE
INFORMATION.IF YOU FIND ANY DISCREPANCIES YOU MUST CONTACT THE DIVISION, AT NO COST, WITHIN
30 DAYS OF RECEIVING THIS ACKNOWLEDGEMENT.

**EXHIBIT B**
(Proposed Order)

*Prepared and Submitted by:*

David H. Leigh, Esq. (A9433)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Beneficial Tower
Salt Lake City, Utah  84101
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800
E-mail:  dleigh@swlaw.com

Attorneys for **FINANCIAL FEDERAL CREDIT INC.**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**WOLPER CONSTRUCTION, INC. aka WOLPER LANDSCAPING AND CONSTRUCTION,**<br><br>Debtor. | Bankruptcy No. 08-24034<br><br>Chapter 11<br><br>Honorable William T. Thurman |

---

## ORDER GRANTING STIPULATED MOTION
## AND TERMINATING AUTOMATIC STAY

---

This matter is before the Court on the *Stipulated Motion for Entry of Order Terminating Automatic Stay*, dated July 14, 2008 (the "Stipulation and Joint Motion"), filed jointly by Wolper Construction, Inc. aka Wolper Landscaping and Construction, the Debtor in the above-captioned

Chapter 11 bankruptcy case (the "Debtor"), and Financial Federal Credit Inc., a secured creditor of the Debtor ("FFCI") (together, with the Debtor, the "Parties"). The Court, after considering the Stipulation and Joint Motion and such other matters in the Court's file as the Court deemed appropriate, finds and concludes that the Stipulation and Joint Motion is well-taken, and that the relief requested therein should be granted. Based upon the foregoing and good cause appearing therefor, **IT IS HEREBY ORDERED** as follows:

1.     The Stipulation and Joint Motion shall be, and it hereby is, approved in all its particulars, and the relief requested therein shall be, and it hereby is, granted without the need for further notice or a hearing.

2.     The automatic stay imposed by 11 U.S.C. § 362(a) shall be, and it hereby is, terminated, effective immediately, as it relates to FFCI and the Surrendered Equipment.[1]

3.     FFCI shall be, and it hereby is, authorized to foreclose upon, sell or otherwise liquidate its interest in the Surrendered Equipment pursuant to applicable non-bankruptcy law.

4.     Pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3), this Order shall take effect immediately, and the ten (10) day stay period shall not apply.

*******END OF TEXT*******

---

[1] As defined in the Stipulation and Joint Motion.

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following parties via the Court's CM/ECF system:

- James W. Anderson    anderson@mmglegal.com
- Mona Lyman Burton    mburton@hollandhart.com, ckelly@hollandhart.com
- Andres' Diaz    courtmail@adexpresslaw.com
- Dennis R. James    djames@mmrj.com
- Peter J. Kuhn tr    Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov
- David H. Leigh    dleigh@swlaw.com
- David E. Leta    dleta@swlaw.com, wsmart@swlaw.com,;kgoley@swlaw.com
- Stephen W. Lewis    slewis@utah.gov
- Adelaide Maudsley    maudsley@chapman.com, jemery@chapman.com
- Robert S. Prince    rprince@kmclaw.com, squilter@kmclaw.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Kim R. Wilson    bankruptcy_krw@scmlaw.com

I hereby certify that a true and correct copy of the foregoing was served on the following parties by depositing a copy of the same in the United States mail, first class postage prepaid, addressed as follows:

Scott Rasmuson
White and Rasmuson
2195 West 5400 South, Suite 200
Salt Lake City, UT 84118

_____